# United States District Court
## For The Northern District of Illinois
## At The Eastern Division

RECEIVED

DEC 2 6 2007
DEC 26 2007
MICHAEL W. DOBBINS
CLERK, U. S. DISTRICT COURT

PAUL VEGA
PETITIONER

E.E.O.C. CHARGE # 444-2008-00252

Vs.

}

07CV7220
JUDGE DER-YEGHIAYAN
MAGISTRATE JUDGE NOLAN

HEARTLAND ALLIANCE
RESPONDENT

## EMPLOYMENT DISCRIMINATION COMPLAINT AT LAW UNDER Title 42 U.S.C. §2000(e), et al & Title 15 U.S.C. §1681, et al (FCRA)

1.) The Petitioner, brings this employment discrimination[1] complaint against the Heartland Alliance, a 501(c)(3) corporation incorporated under the statues of the Internal Revenue Code[2] of the United States of America and under the statues of the State of Illinois[3] and registered as a not-for-profit entity with both the Illinois Attorney General's Office[4] and the Illinois Secretary of State's Office.[5]

2.) The Petitioner in this employment discrimination complaint is Paul Vega, a citizen of the United States of America, who currently resides in the City of Chicago in the northern-eastern County of Cook within the State of Illinois.

3.) The Respondent is this employment discrimination complaint is the Heartland Alliance, a 501c3 corporation incorporated under the statues of the Internal Revenue Code of the United States of America and under the statues of the State of Illinois and registered as a not-for-profit entity with both the Illinois Attorney General's Office and the Illinois Secretary of State's Office, whose primary business address in the awardment of governmental contracts, grants, gifts, etc., is 208 S. LaSalle Street, Suite, 1818, CHICAGO, ILL., 60604, 312.660.1300.[6]

4.) The Petitioner, on or about 6th October 2003 sought employment[7] with the Respondent at 208 S. LaSalle Street, Suite, 1818, CHICAGO, ILL., 60604, 312.660.1300.

5.) The Petitioner was denied employment[8] on or about 6th October 2003 by Respondent at 208 S. LaSalle Street, Suite, 1818, CHICAGO, ILL., 60604, 312.660.1300.

6.) The Petitioner has been denied employment constantly, to such an extent by the Respondent, that the Petitioner has been unable to defend his dental health, or accumulate sufficient operating capital to finance a mortgage or to be able to provide for a family. As a result of Respondent constantly denying the Petitioner access to an income the Petitioner was forced to ask the Respondent in February 2003 to extend to the Petitioner an expenditure item to cover an expense the Petitioner was near default, due to the Respondent denying employment constantly to the Petitioner, by relying on the materials used by Susan and Dr.

1

Anthony Spahr, Ph.D., in which ultimately the Petitioner wasn't able to maintain solvent, even though Petitioner continued to fax & e-mail his resume to the Respondent repeatedly over a period of 20 months from February 2003 to September 2004. By denying the Petitioner constantly employment & health insurance package, the Respondent contributed to Petitioner losing several teeth, losing real property & losing living arrangements at property managed by the Northwoods Reality Group in September 2004. This was the manner in which the Respondent upheld Petitioner's human rights in Illinois, to wit: by Heartland Alliance hiring mentally incapacitated hiring managers placed into capacities which delegated to such the ability to hire and dismiss personnel, with such process in place at Heartland Alliance, Petitioner's resume could never survive past the review of incompetent hiring managers incorrectly employed by Heartland Alliance.

7.) The Respondent, Heartland Alliance, therefore discriminated[9] against the Petitioner on or about or beginning on or about 6th October 2003 and continues to do so to this date by refusing to indicate to Petitioner the reason Respondent, Heartland Alliance refused to hire Petitioner, leaving him only to speculate as to the reasons Respondent, Heartland Alliance refused to hire Petitioner. However, Respondent, Heartland Alliance, operates a hiring practice cycle of openly hiring without regard mentally diseased HIV/AIDS Jewish homosexuals who hire former mental patients ordered institutionalized and/or incarcerated in other states outside Illinois who are infected with mental disorders along with, physical diseases, impaired judgments that will openly discriminate against everyone else by being awarded the ability to hire a disproportionate number of Jewish mental patients like themselves in relation to the Jewish client mental patient population actually enrolled as program participants[10] to only then have the disproportionate number of former Jewish mental patients in relation to the Jewish client mental patient population engage in perverted mind-games with displaced populations in 60640 by:

   A.) Making these displaced populations dependant on psycho-tropic medications (to insure their critical thinking skills are disoriented);

   B.) Making these displaced populations dependant on the alleviation of hunger, that is, using the threat of hunger as a tool to manipulate these displaced populations into their financial reporting rolls; &

   C.) Hiding these displaced populations who are the collateral casualties of the federal and state war on guns, gangs and drugs, out of site from society in order to attract foreign investment and capital improvements into 60640 in the manner of public works/infrastructure improvements of which these displaced populations are not the title holders of any of these real property upgrades.

8.) The Respondent, Heartland Alliance, isn't a federal agency created by statues of the United States Congress and the Petitioner, has filed charges against the Respondent, Heartland Alliance asserting the acts of discrimination indicated in this complaint with the United States Equal Employment Opportunity Commission (EEOC) on or about 10th October 2007. A copy of said charge is attached as Appendix I. It is the policy[11] of both the United States Equal Employment Opportunity Commission (EEOC) & the Illinois Department of Human Rights (IDHR) to cross-file with the other agency all charges received. The Petitioner has no reason to believe at this point that this policy was not followed in this cause.

9.) The United States Equal Employment Opportunity Commission (EEOC) has issued a *Notice of Right to Sue*, on 18th October 2007. A copy of said *Notice of Right to Sue* is attached to this COMPLAINT AT LAW as Appendix II.

10.) The Respondent, Heartland Alliance, a 501c3 corporation incorporated under the statues of the Internal Revenue Code of the United States of America and under the statues of the State of Illinois and registered as a not-for-profit entity with both the Illinois Attorney General's Office and the Illinois Secretary of State's Office discriminated against the Petitioner's social class status as a consumer engaged in the exchange of goods and services by judging his credit worthiness,[12] his socio-economic status[13] & his market value in denying him employment[14] repeatedly since 6th October 2003 as retaliation[15] against the Petitioner by violating the Fair Credit Reporting Act (15 USC § 1681) using consumer reports[16] generated by historically corrupt[17] & diseased entities[18] currently acting as Consumer Reporting Agencies in the Chicago SMSA to judge the

Petitioner's qualifications. The utilization of reliance on the subject consumer reports[19] generated by corrupt entities[20] currently acting as Consumer Reporting Agencies in the Chicago SMSA in effect creates a platform of long term social marginalization and social stratification of entire particular ethnic populations perpetually over generations which has a cumulative effect of exerting social[21] & psychological[22] control in the religious reliance of fabricated consumer reports as a form of political blackmail,[23] but moreover and more importantly, such religious reliance on the subject consumer reports serves to psychologically degrade, dehumanize, humiliate and destroy families by maintaining without consent such via coercion in poverty.

II.) In further support of Petitioner's claim of employment discrimination against the Heartland Alliance, the following is offered:

a.) On Tuesday, 22nd August 2006 correspondence was forwarded to Ms. Lizbeth Sode in her then capacity of V.P. of Human Resources with the Heartland Alliance and to Ms. Betsy Leonard in her then capacity as Director of the Employee Services and Workforce Development Office with the Heartland Alliance relating to the events between 24th September 2003 to 06th October 2003, which regarded Dr. Anthony Spahr, Ph.D., and Susan, the hiring manager at the Saura Center located then as now in the Logan Square community. 3Qs were also added due to information brought to the attention of Petitioner by professional reliable community sources at the Bridgeview Bank Building, formerly known as the Uptown Bank Building. The replies to these 3Qs along with the information gathered and used by Susan in her capacity as hiring manager at the Saura Center to make a determination as to Petitioner's qualifications, along with analytical, cognitive, quantitative & qualitative skills-sets have yet to be tendered to Petitioner.[24]

b.) On Wednesday, 14th March 2007 Dr. Sid Mohn, Ph.D., in his capacity as Executive Director of the Heartland Alliance refused to provide[25] to Petitioner a reply to the 3Qs noted in above §IIa along with the information gathered and used by Susan in her capacity as hiring manager at the Saura Center to make a determination as to Petitioner's qualifications, along with analytical, cognitive, quantitative & qualitative skills-sets.

c.) On Tuesday, 17th April 2007, Ms. Barbara Weiner, J.D., a Jewish lesbian in her capacity as General Counsel for the Heartland Alliance[26] indicated to Petitioner that should Petitioner continue to inquire with Heartland Alliance as to the reasons for which Heartland Alliance has continued to refuse to provide Petitioner, the replies to the 3Qs drafted on Tuesday 22nd August 2006 in correspondence which was forwarded to Ms. Lizbeth Sode in her then capacity of V.P. of Human Resources with the Heartland Alliance and to Ms. Betsy Leonard in her then capacity as Director of the Employee Services and Workforce Development Office with the Heartland Alliance relating to the events between 24th September 2003 to 06th October 2003, which regarded Dr. Anthony Spahr, Ph.D., and Susan, the hiring manager at the Saura Center located then as now in the Logan Square community pertaining to the information gathered and used by Susan in her capacity as hiring manager at the Saura Center to make a determination as to Petitioner's qualifications, analytical, cognitive, quantitative & qualitative skills-sets, that if such continued, Ms. Barbara Weiner, J.D., a Jewish lesbian had instructed employees of Heartland Alliance to call the Chicago Police Department to confront Petitioner with the threat of violence if Petitioner persisted to inquire as to the reasons Heartland Alliance constantly refuses to provide to Petitioner the replies to the 3Qs drafted on Tuesday 22nd August 2006 in correspondence which was forwarded to Ms. Lizbeth Sode in her then capacity of V.P. of Human Resources with the Heartland Alliance and to Ms. Betsy Leonard in her then capacity as Director of the Employee Services and Workforce Development Office with the Heartland Alliance relating to the events between 24th September 2003 to 06th October 2003, which regarded Dr. Anthony Spahr, Ph.D., and Susan, the hiring manager at the Saura Center located then as now in the Logan Square community pertaining to the information gathered and used by Susan in her capacity as hiring manager at the Saura Center to make a determination as to Petitioner's qualifications, analytical, cognitive, quantitative & qualitative skills-sets.

d.) Subsequently, Ms. Barbara Weiner, J.D., a Jewish lesbian was corrected in correspondence to her by Petitioner on 17th April 2007,[27] pertaining to her incorrect assessments in relation to Petitioner's attempts to ascertain the reasons for being denied employment opportunities at Heartland Alliance as illustrated above in §IIc. Further, correspondence was tendered to the Executive Assistant of the Executive Director of Heartland Alliance prior to, calling into question the practices employed at said which only entitled HIV/AIDS Jewish homosexuals to be hired at the expense of better qualified applicants.[28] In fact, the Executive Assistant of the Executive Director of Heartland Alliance indicated to Petitioner verbally in a face to face discussion that Heartland Alliance *"helps people find work."*[29] But apparently this statement did not apply to the Petitioner.

e.) Heartland Alliance has on two prior occasions, between FY 2003 & FY 2007, during the actual duration of this complaint period, as reflected in the ethnic-graphic record, Heartland Alliance has been the subject of serious unprofessional mal-practice claims by those Heartland Alliance purports to service in regards to discriminatory methods along with incompetent decision-making assessments in the manner in which Heartland Alliance delivers federally funded tax-payer housing services and federally funded tax-payer health services which lends credence to Petitioner's position of discriminatory practices leveled against the Respondent.[30]

f.) Heartland Alliance contradicts itself by publically stating;

> *"Poverty and economic hardship deprive individuals of their human rights. Human rights are universal rights belonging to each of us by virtue of being human and are based on the notion of personal human dignity and worth. Poverty erodes a family's ability to put a roof over their head, clothe their children, and provide nutritious meals; it builds obstacles to quality education and adequate healthcare; it limits people's chances and restricts opportunity — all of which are violations of human rights,"[31]*

only to deny the Petitioner employment & health insurance, and threaten the Petitioner with violence. Heartland Alliance absolutely remained indifferent even after this contradiction was brought to its attention[32] in correspondence addressed to the Office of the Heartland Alliance Executive Director as a response to said refusing to meet 30 minutes to discuss at said's leisure the 3Qs posed to Ms. Sode & Ms. Leonard on Tuesday, 22nd August 2006.

g.) Additionally, pronouncements made by experts at Workshops, Seminars, Conferences, & Forums where the make-up of the audience is composed of professionals representing multi-disciplinary professions lend to support Petitioner's argument and contradict the Respondent's position, policy or methods, to wit:

I.) During the <u>Human Resource Executive's 9th Annual HR Technology Conference & Exposition</u> held at Navy Pier, Illinois from 4th-6th October 2006, in a seminar entitled, *Avoid Breaking The Law With Criminal Background Checks!*, facilitated in Festival Hall A-OS4/Room 305 presented by Mrs. Pamela Q. Devata, J.D., an Associate at Seyfarth Shaw LLP on Thursday 5th October 2006 @ 1345 HRS CST–1500 HRS CST, Mrs. Devata, J.D., argued before a group of at least 30 professionals that included the Technology Editor of the Society For Human Resource Management the effects of Adverse Action[33] as it pertained to the Fair Credit Reporting Act, which by the way was not attended by any staff person of the Heartland Alliance. Heartland Alliance's reliance on the materials used by Susan and Dr. Anthony Spahr to deny Petitioner employment was adverse action which violated provisions of the FCRA.

II.) During the <u>2006 NBTA Conference & Exposition</u> held at the McCormack Place Hyatt complex, at the *KEYNOTE* address by Carleton Fiorina, on the Exposition Floor on 19th July 2006 at 0930-0945 HRS CST, Carleton Fiorina indicated, '*Choose to define yourself. Do not allow others to define you.*' Carleton argued her point before at least 1500 breakfast attendees, which by the way was not attended by any staff person of the Heartland Alliance. Heartland Alliance's reliance on the materials used by Susan and Dr. Anthony Spahr to deny Petitioner employment allowed the materials in question to define the Petitioner and prevented the Petitioner from defining himself by not allowing him the opportunity to secure an income in order to finance a mortgage and in order to provide for a family.

III.) During the <u>SPAIN/USA INVESTMENT & BUSINESS COOPERATION FORUM</u>, held at the Mid-America Club in the Aon Building, 200 East Randolph Drive at the 80th floor on Monday, 16th April 2007 in the Grand Ballroom, Jack Lavin, in his official capacity as Executive Director of the Illinois Department of Commerce and Economic Opportunity, argued before nearly 100 audience members that, '*The doors are open for business in Illinois*' and that '*Illinois has good jobs to raise families,*' which by the way was not attended by any staff person of the Heartland Alliance. Heartland Alliance's reliance on the materials used by Susan and Dr. Anthony Spahr to deny Petitioner employment denied the Petitioner the opportunity in Illinois to raise a family and closed the door on Petitioner to initiate any type of business venture in Illinois.

h.) Adverse Action has been defined and made clear in the 7th Circuit.[34]

12.) As such, Petitioner demands that this cause be tried by a jury.

4

13.) THEREFORE, in the event Petitioner prevails at trial, the Petitioner prays that this Court grant the following relief to Petitioner, to wit: Direct the Heartland Alliance, a 501c3 corporation incorporated under the statues of the Internal Revenue Code of the United States of America and under the statues of the State of Illinois and registered as a not-for-profit entity with both the Illinois Attorney General's Office and the Illinois Secretary of State's Office to financially compensate Petitioner both monetarily & punitively[35] in the amount of $5M U.S. dollars retroactively to FY 2003 for repeatedly violating Petitioner's human rights by utilizing perverted HIV/AIDS Jewish homosexuals[36] who otherwise would be homeless & unemployed, but living temporarily at International Youth Hostels cleaning kitchens and toilets as conditions to housing arrangements in attempts to have perverted conversations[37] designed to hide the fact of Susan and Dr. Anthony Spahr, Ph.D., refusing to extend credit & capital in the form of employment to Petitioner in even an entry level position at a firm that claims to society to champion human rights in Illinois in order to send a clear message to the designers of corrupt social/political policies in Illinois that this type of discrimination[38] created and designed by perverted HIV/AIDS Jewish homosexuals[39] creates an unfair discriminatory double-standard by:

> i.) Hiring any HIV/AIDS Jewish homosexual from outside Illinois who has been ordered institutionalized in medical facilities, but shield such records in the hiring process in Illinois;
> ii.) Hiring any HIV/AIDS Jewish homosexual who has been ordered incarcerated for perverted acts[40] outside Illinois, but shield such records in the hiring process at Heartland Alliance by not taking such into consideration;
> iii.) Hiring any HIV/AIDS Jewish homosexual who has been ordered institutionalized in Illinois' medical facilities, but shield those records in the hiring process at Heartland Alliance by invoking confidentiality;[41]

This unfair discriminatory double-standard should not be tolerated in Illinois or elsewhere in the United States in Q4 FY 2007 or in any future time in the 21st century.  These records noted via i-iii are only available for review in North American, European Union(Euro-Zone), & Israeli case law or other public record sources contained in the ethnic-graphic literature within the periodical indexes of social sciences located within the institutions of higher learning across the globe, which isn't considered during the hiring process at the Heartland Alliance. Heartland Alliance only considers recommendations made to it by subscribing to online databases under the control and current influence of the Chicago Police Department, Cook County Sherriff's Office, Illinois State Police, Clerk of the Circuit Court of the County of Cook, Illinois Department of Corrections and the Illinois Department of Human Services, all of said entities which are under the control of administrative personnel, i.e., merit compensation managers[42] who are given consideration politically under partisan terms by delegates of the Central Committees of the Cook County Democratic Party and the Illinois Republican Party, both active partners on the war of guns, gangs and drugs,[43] but who on occasion back-stab each other for political gain in Illinois as can be seen with the recent downfall of Ex-Governor George Ryan, (R)-Illinois. And if any consumer engaged in the exchange of goods and services in the Chicago SMSA happens to have his or her name, D.O.B., S.S. or any other related credit information fraudulently entered and stored into the above named databases, that person will suffer economic hardship or economic sabotage of his or her financial portpholio because he or she will be discriminated against in his or her efforts to restore or recover economic losses as a residual result of having his or her credit information entered & stored on such databases and used to make judgment determinations on the employability of a person, no matter if in fact, such was fraudulently fabricated by corrupt elements, exploiting the Illinois tax-payer, as an effort to drive a person into disenfranchisement. Thus families will become financially destroyed and forced into long term poverty.  Similarly, entities such as Heartland Alliance that claim to champion human rights in Illinois will actively discriminate against any person in his or her efforts not only to rehabilitate a financial portpholio but also in efforts to access the credit and capital required to provide for a family by basing their hiring protocols on the databases under the control and current influence of historically corrupt entities such as the Chicago Police Department, Cook County Sherriff's Office, Illinois State Police, Clerk of the Court of the County of Cook, Illinois Department of Corrections and the Illinois Department of Human Services. The head of a household or the main bread winner in a family unit will be degraded and treated as if he or she were a black criminal warehoused in the IDOC or will be degraded and treated as if he or she were warehoused mental patients in the IDHS or will be degraded and treated as if he

or she were any other black criminal warehoused in welfare systems[44] in Illinois. Essentially, these perverted HIV/AIDS Jewish homosexuals not only have managed to render dysfunctional social systems perpetually in the Chicago SMSA, but have found a manner in which to circumvent methods of inspection and detection of criminal deviant behavior as condition to employment at the Heartland Alliance, or at any other organization, institution or corporation in Illinois. Paradoxically, Heartland Alliance offers employment and embraces, certain types of criminals,[45] criminals with likable personalities, fun-loving criminals. Criminals who are primarily mentally ill Jewish homosexuals. Those are the only criminals Heartland Alliance offers financial assistance to, financial assistance which allows perverted Jewish criminals to live a perverted life-style that poses a public health threat to society, particularly in 60640, 60613 & 60657. A prime example of this pattern, are the actions of Ms. Hiedi Nelson approving to allow an HIV/AIDS Jewish homosexual (John Spears) to create an quasi-loft meeting space[46] that doubled as over-night living quarters on the northeast end of the 5th floor suites rented by Heartland Alliance from the Institute For Cultural Affairs and extended that quasi-loft meeting space which doubled as over-night living quarters to Jessica Young, a Jewish lesbian and Matthew Silver, a Jewish homosexual(both employed at Heartland Alliance from Q4 FY 2004 to June 2005) and to countless other HIV/AIDS Jewish homosexuals(formerly employed at Heartland Alliance from Q4 FY 2004 to June 2005) who otherwise who be homeless, unemployed and forced to sleep at the R.E.S.T. shelter in 60640 or at any other shelter in the northern-eastern County of Cook in Illinois.

14.) Petitioner prays this Court grant the Petitioner appropriate relief, lost wages,[47] liquidated/double damages, front pay, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witness fees.

OFFICIAL SEAL
TODD NELSON
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES.09\02\09

PREPARED & SUBMITTED BY;

P. Vega
Petitioner
1.603.907.2421 CELL
1.253. 498-4735 e-fax
lasvegas1999@gmail.com

_____    12/21/07
PUBLIC NOTARY SIGNATURE          DATE

Signed Before Me On This __21st__ Day of DECEMBER MMVII AD

CC: File

_____    21 Dec 2007
SIGNATURE & DATE

---

[1] 42 U.S.C. § 2000e-3(a), Other Unlawful Employment Practices: Discrimination For Making Charges, Testifying, Assisting, Or Participating In Enforcement Proceedings, "It shall be an unlawful employment practice for an employer to discriminate against any....... applicants for employment....or...to discriminate against any individual.......because he has.........participated in any manner in an investigation.....";

    A.) CARL MCKNIGHT, Plaintiff, v. CHICAGO HOUSING AUTHORITY, Defendant., No. 96 C 4389, UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, 2001 U.S. Dist. LEXIS 13011, 22nd August 2001, Decided, 23rd August 2001, Docketed, "In order to establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a statutorily protected activity, (2) he suffered an adverse action, and (3) there is a causal link between his discharge and the protected activity. Russell v. Board of Trustees of the Univ. of Illinois at Chicago, 243 F.3d 336, 2001 WL 225051 (7th Cir. 2001);

    B.) CARL MCKNIGHT, Plaintiff, v. CHICAGO HOUSING AUTHORITY, Defendant., No. 96 C 4389, UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, 2001 U.S. Dist. LEXIS 13011, 22nd August 2001, Decided, 23rd August 2001, Docketed, "In order to satisfy this first element of a prima facie case, plaintiff does not need to demonstrate that he was harassed or discriminated against but instead that he thought he was challenging unlawful activity." Holland v. Jefferson Nat'l Life Ins., Co., 883 F.2d 1307, 1314 (7th Cir. 1989);

    C.) CHERYL GEIST, Plaintiff, v. GLENKIRK, Defendant., 01 C 0700, UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, 2001 U.S. Dist. LEXIS 17366, 22nd October 2001, Decided, 23rd October 2001, Docketed, "To state a claim of retaliation, plaintiff must allege that: (1) she

was engaged in a protected activity under Title VII, (2) she suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse action. <u>Stutler v. Illinois Dept. of Corr.</u>, 263 F.3d 698, 702 (7th Cir. 2001). A broad range of conduct may be considered retaliatory; the law does not take a 'laundry list' approach to retaliation because 'its forms are as varied as the human imagination will permit.'" <u>Knox v. State of Indiana</u>, 93 F.3d 1327, 1334 (7th Cir. 1996) (holding that co-worker campaign of vicious gossip and profanity aimed at making plaintiff's life 'hell' constituted an adverse employment action);

[2] 26 U.S.C. § 501(c)(3)

[3] 805 ILCS §105/108.70

[4] See http://www.illinoisattorneygeneral.gov/rights/index.html; http://www.illinoisattorneygeneral.gov/charities/index.html; 89 Illinois Administrative Code Chapter III, Subchapter e, § 404.4

[5] See http://www.cyberdriveillinois.com/departments/home.html; 14 Illinois Administrative Code Subtitle B, Chapter II, Part 400, § 400, Appendix A

[6] See http://www.heartlandalliance.org/aboutus/documents/HeartlandAlliance2007AnnualReport.pdf @ Page 34; At page 23 of said, almost 72% of Heartland Alliance income for FY 2007 was derived from federally funded tax-payer sources. A further precise amount is tabulated in an audited financial statement which Ms. Barbara Weiner, J.D., a Jewish lesbian has instructed the Heartland Alliance CFO not to provide to the Petitioner.

[7] See E-mail dated Tuesday 7th October 2003 at 21:00:111 CST, From: P. Vega lasvegas_1999@excite.com To: TSpahr@heartlandalliance.org Cc: BLeonard@heartlandalliance.org Subject: Employment Opportunities Asstistance, in part states,

"Dr. Anthony E. Spahr, PhD
Vice President, Human Resources & Administration
Heartland Alliance
208 South LaSalle
Suite 1818
Chicago, Illinois 60604
312.660.1300
TSpahr@heartlandalliance.org

Dear Dr. Spahr:

Greetings. Dr. Spahr, a copy of this letter is being forwarded to Ms. Leonard as well for edification purposes. Your assistance would be greatly appreciated in this matter addressed within. The problem is the following. For the past several weeks now, resumes have been either faxed or e-mailed to the Heartland Alliance HR Department in response to employment ads that have appeared on www.socialservice.com, www.npo.net, www.americasjobbank.org, or on http://www.heartland-alliance.org/jobs_vol.asp placed there by the aforementioned. The most recent being in reply to the posting of the position of Policy & Program Liaison. During early 09/2003, a resume was sent to the HR Department via fax in response to the position of Case Manager Job Code: 090303B needed at the Saura Center. Subsequently, Mr. Coppage, a supervisor of programs over at the Saura Center during the week of 09/14/2003 contacted Paul Vega at 603.907.2421 to arrange for an interview at the Saura Center on 09.24.2003 at 12 PM for the position 090303B. On 09.24.2003, Mr. Coppage interviewed Paul Vega in the foyer reception room of the Saura Center for position 090303B. Mr. Vega filled out the downloaded pdf file Heartland Alliance application, attaching his date of birth, social security number and responding to the affirmative on an adjudication question which occurred in 1993. During the meeting, Mr. Coppage was friendly and out-going. Mr. Coppage indicated that he needed to fill the position as soon as possible because staff openings were pending the transfer of staff to another program. Mr. Coppage indicated that he would pass on to Susan, his immediate supervisor, the resume of Paul Vega along with the application materials and that Susan would then schedule an interview with Paul Vega before 10.01.2003 to discuss the position of 090303B. Mr. Coppage also indicated that he was aware that there were other positions available within other programs of the Heartland Alliance and that he would forward the resume to those respective supervisors in the event no materialization of position 090303B occurred. From 09/24/2003 to the present day, Susan never called Mr. Vega for a 2nd interview nor did she indicate to Mr. Vega her reasons for not doing so. On 10.01.2003, Paul Vega spoke with Mr. Coppage and asked if there was any problems with his application materials and Mr. Coppage indicated he had no knowledge of any such problems. On 10.06.2003, Paul Vega, again spoke with Mr. Coppage. Mr. Coppage, in a completely change of tone with Paul Vega, indicated that all of the positions at the Saura Center were effectively filled and that he had forwarded all relative application materials back to the HR Department. Please advise Mr. Vega, if in fact, during the period from 09.24.2003 to 10.06.2003, there has been any information obtained as to provide a negative reference that would have weighed in against Mr. Vega in not further considering his employment with the Heartland Alliance. If there in fact, exist such a negative reference that has been presented to the HR Department, Mr. Vega would like the opportunity to discuss it

7

to clear up any questions. Mr. Vega is in need of employment and would be more than happy to meet with you or anyone else to discuss his life experiences and his future goals. He has had no luck in obtaining employment full time that provides health insurance/dental coverage. He would like your help in this matter. Would you please see if you could help him."

[8] See E-mail dated Wednesday 8th October 2003 at 22:36:04 CST, From: Tony Spahr <TSpahr@heartlandalliance.org To: lasvegas_1999@excite.com> Cc: Betsy Leonard <BLeonard@heartlandalliance.org Subject: RE: Employment Opportunities Asstistance, stated in part,

"Dear Mr. Vega,

It is apparent that the last few years have been very difficult for you. I am sorry for this and understand your frustration in not being able to find a job, especially when you believe you are qualified for the positions for which you have applied, and insurance issues are involved. Please be assured that Heartland Alliance never uses an Applicant's Social Security Number or Date of Birth Information to evaluate his/her ability to successfully perform the associated job duties of the position for which he/she has applied without his/her previous written authorization. Perhaps not using "third person" references to yourself might increase the likelihood of you being considered for open positions within Heartland Alliance and other organizations. I offer this suggestion as a professional with 20 years of human resources management experience.

Sincerely,
Anthony E. Spahr, Ph.D.
Vice President,
Human Resources and Administration"

[9] 15 U.S.C. § 1681m Requirements On Users Of Consumer Reports; Title 16 CFR Commercial Practices: CHAPTER I-- FEDERAL TRADE COMMISSION Subchapter F THE FAIR CREDIT REPORTING ACT

[10] NOTE I: According to independent observations made on the 5th Floor premises at the Institute For Cultural Affairs that were brought to the attention of the Petitioner, in efforts to ascertain the reasons the Petitioner was denied employment by Heartland Alliance since September 2003, it was discovered that as late as June 2005, enrolled Jewish clients in the HHO ACCESS Program numbered 55 out of a total 5100 tolling HHO ACCESS Program Clients in FY 2005, however, this figure only accounts for 55% of the total HHO ACCESS Program Participants. A ratio of 1:20. On the other hand, Jewish staff employed at the HHO ACCESS Program number 510 out of a total of 540 tolling HHO ACCESS Program staff positions in FY 2005, subsequently, this figure accounts for 525% of the HHO ACCESS Program staff positions budgeted for FY 2005. A ratio of 1:4. Therefore, the % rate of HHO ACCESS Program Jewish staff exceeds the % rate of HHO ACCESS Program Jewish enrolled clients in FY 2005 by 20%. Conversely, the ratio of HHO ACCESS Program Jewish staff exceeds the ratio of HHO ACCESS Program Jewish enrolled clients in FY 2005 by 20%. It is safe to say, that this data reflects the disproportion of the two variables in question. Additionally, 75% of the Jewish HHO ACCESS Program staff are of homosexual preferences. 100% of the Jewish HHO ACCESS Program staff are unqualified, inexperienced, incompetent & dishonest, and are otherwise the same type of character as is Michael L. Jackson, the AIDS/HIV positive Jewish homosexual convicted of capital 1st degree murder charges in Cook County, Illinois in August 2006. This pattern is consistent with other demographic disproportionate characteristics.

NOTE: II  See CHICAGO JEWISH NEWS, Friday, 17th November 2006 To Thursday, 23rd November 2006, 26th Cheshvan 5767, Vol. XXIII, Issue VII, Jews, Jews Everywhere, by Aaron Joseph @ Page 34, "For starters, take the U.S. Senate where thanks to victories by two new Jews, there are now 13, count 'em, 13 Jewish senators. 13. Meaning 13 percent of the Senate is Jewish, in a country where Jews barely make up two percent of the population."

NOTE III: In Q4 2007, there are 29 Jews in the United States House of Representatives out of 435 seats. (6%)

NOTE IV: One of these Heartland Alliance Jews, who just happen to be HIV/AIDS positive homosexual and formerly an institutionalized mental patient in New York State, who wasn't a property owner at all in either 60640 or elsewhere, but who instead rented in 60613 in June 2005, used his Heartland Alliance issued cell phone on Monday 28th February 2005 to place a call to the CPD in an attempt to manipulate the responding CPD Officer into a potentially harmful situation by instigating the potential threat of violence against the Petitioner. Unbeknown to the Petitioner however, this former institutionalized HIV/AIDS positive Jewish homosexual mental patient in New York State in question, subsequently filed an unauthorized forged and fraudulently submitted IDHS LINK & Social Security Disability application at the Lawrence Avenue IDHS Field Office in Q1 FY 2005, which bears his signature, Jack Nieditch.

NOTE V:  See 911 Record Transcript of communication placed on Monday 28th February 2005 on file in central database of the Office of Emergency Management from the Heartland Alliance issued cell phone of Jack Nieditch between 1330 HRS CST & 1400 HRS CST to City of Chicago 911 Center.

[11] See http://www.state.il.us/dhr/charges/Chrg_Proce.htm

[12] (Company violated 15 U.S.C. § 1681m(a) by failing to inform applicant of name and address of credit bureau upon whose report denial of credit was based; court would reject company's arguments that (1) denial of credit was not based upon report, where letter from company to applicant stated that credit denial was based upon report; (2) that company did furnish

plaintiff with required information, court noting that full compliance only came about after two violations had already been committed; and (3) that company was entitled to 'reasonable procedures' defense set out at § 1681m(c), where company's procedure was only to supply specific reasons for denial of credit upon receipt of request for such information.) Carroll v Exxon Co., U.S.A. (1977, ED La) 434 F Supp 557

[13] FORMAN FRIEND, Plaintiff, v. ANCILLIA SYSTEMS INCORPORATED, an Illinois not-for-profit corporation, Defendant., No. 99 C 3895, UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, 68 F. Supp. 2d 969; 1999 U.S. Dist. LEXIS 10114, 21st September 1999, Decided, 22nd September 1999, Docketed, "15 U.S.C. § 1681a(d)(1) defines a consumer report as 'any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for -- (B) employment purposes.' A consumer reporting agency is defined as 'any person which, for monetary fees, dues, or a cooperative non-profit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.'" 15 U.S.C. § 1681a(f).

[14]    A.) (To state claim for adverse action based on improper denial of credit under 15 U.S.C. § 1681m(a), consumer must first demonstrate that she actually was denied credit by creditor.) Austin v J.C. Penney Co. (2001, ED Va) 162 F Supp 2d 495.

B.) (In determining whether conviction of employee is job related, employer must examine all relevant factors to determine whether conviction affects individual's ability to perform job, and relevant facts include; (1) nature, number and circumstances of offense for which individual was convicted; (2) length of time intervening between conviction for offense and employment decision; (3) individual's employment history; (4) individual's efforts at rehabilitation.) EEOC Dec No. 81-15 (Jan 19, 1981)

[15]    A.) (Employer is liable for violation of 15 U.S.C. § 1681m(a), where it admits to policy of making adverse employment decisions based upon credit reports of applicants without informing them as required, because excuse that human resources manager neglected to read guide outlining notification requirements is not viable § 1681m(c) 'reasonable procedures' defense.) Mathews v Government Emples. Ins. Co. (1998, SD Cal) 23 F Supp 2d 1160, 14 BNA IER Cas 741

B.) (For purposes of Title VII retaliation claim, adverse employment action is not limited solely to loss or reduction of pay or monetary benefits; it can encompass other forms of adversity as well.) Smart v Ball State Univ. (1996, CA7 Ind) 89 F3d 437, 71 BNA FEP Cas 495, 68 CCH EPD P 44212 (criticized in Axel v Apfel (2000, DC Md) 171 F Supp 2d 522)

C.) (Co-worker hostility or retaliatory harassment, if sufficiently severe, may constitute adverse employment action for purposes of Title VII retaliation claim.) Gunnell v Utah Valley State College (1998, CA10 Utah) 152 F3d 1253, 79 BNA FEP Cas 112, 4 BNA WH Cas 2d 1488, 73 CCH EPD P 45448, 135 CCH LC P 33719, 1998 Colo J C A R 4356 (criticized in Madeja v MPB Corp. (2003) 149 NH 371, 821 A2d 1034) and (criticized in Compton v HPI Acquisition Co. (2004, ED Tenn) 2004 US Dist LEXIS 27701).

D.) (Employee's termination was found retaliatory where employer offered pretextual reason for discharge that it had discovered employee's criminal record, when discharge did not occur until 8 months after discovery, and there was no evidence of business reason that would have forced employer to continue employee's employment during that time period.) EEOC v Carolina Freight Carriers Corp. (1989, SD Fla) 723 F Supp 734, 51 BNA FEP Cas 364, 52 CCH EPD P 39538.

[16]    A.) (Former employee's claim of willful violation of 15 U.S.C. § 1681m(a) will not be dismissed, even though employer maintains that it advised employee of adverse criminal record information contained in consumer report provided to it, because statute requires user of consumer report to disclose name and address of reporting agency when employment opportunity is denied, and it is unclear whether such disclosure was made despite fact that employee visited regional office of agency one day after being fired.) Wiggins v District Cablevision (1994, DC Dist Col) 853 F Supp 484.

B.) (Because of disproportionate adverse impact on blacks of policy of automatic exclusion due to criminal conviction, 42 U.S.C. § 2000e-2 requires employer to consider particular circumstances of each case (such as time, nature, and number of convictions, job relatedness of conviction, and employee's immediate past employment and personal history) when deciding whether employment of that particular person for particular job is manifestly inconsistent with safe and efficient operation of that job; despite employer's contention that its rejection of black applicant was due to mistake, since employer had discontinued its use of criminal conviction as one of employment criteria, employer violated 42 U.S.C. § 2000e-2 where employer admitted that it automatically denied employment opportunity to applicant due to his conviction record. ) (1978) EEOC Decision No. 77-30 (Aug. 15, 1977) CCH EEOC Decisions P 6582.

[17]    A.) Chicago Tribune, Thursday, 29th November 2007 Founded 10th June 1847, 161st Year, No. CCCXXXIII, NEWS Section, ONLINE Edition, Bail Set At $80,000 In Drug Arrest At County Building, by Azam Ahmed;

B.) Chicago Tribune, Thursday, 29th November 2007 Founded 10th June 1847, 161st Year, No. CCCXXXIII, NEWS Section, ONLINE Edition, Ex-Cop Gets 75 Years For Planned Killing, by Azam Ahmed & Kayce T. Ataiyero;

C.) Chicago Tribune, Thursday, 29th November 2007 Founded 10th June 1847, 161st Year, No. CCCXXXIII, NEWS Section, ONLINE Edition, $70,000 Bail For Jail Captain In Bribery Case, Author Unknown;

D.) **Chicago Tribune**, Friday, 30th November 2007 Founded 10th June 1847, 161st Year, No. CCCXXXIV, NEWS Section, ONLINE Edition, New Top Cop Seeks To Fix Broken Trust, by Gary Washburn & Todd Lighty;

E.) **American Pharaoh**, Mayor Richard J. Daley: His Battle For Chicago & The Nation, by Adam Cohen & Elizabeth Taylor, © 2000, Published by Little, Brown, ISBN: 0-316-83403-3(hc)/0-316-83489-0(pb) Chapter VII, Two For You, Three For Me, @ Page 256, "Before the Summerdale scandel was over, eight Chicago policemen were sent to jail. Hundreds more officers submitted to lie-detector tests, and those who refused were suspended. When he arrived at the scene, Wilson shook up the Chicago Police Department staff, and soon the Summerdale scandel receded from the headlines. Unfortunately for Daley, it was quickly replaced by a new scandal over 'loafing' city workers. The city was forced to suspend forty-four employees from the Bureau of electricity for putting in for bogus overtime work. Making matters worse, the fraudulent overtime reports were all prepared by a timekeeper with syndicate ties, who had once run a large West Side betting parlor."

F.) **Harper's Magazine**, September 1964, V. CCXXIX, N. MCCCLXXII, The Illinois Legislature: A Study In Corruption, by Illinois State Senator Paul Simon, (D) 47th District @ Page 74;

G.) **Harper's Magazine**, April 1964, V. CCXXVIII, N. MCCCLXVII, 'How The Police Chief Sees It', by Superintendent O.W. Wilson, Former Dean of the School of Criminology at the University of California at Berkeley, @ Page 140;

NOTE: The 47th District of the Illinois Senate Upper House in FY 1960 was composed of three particular rural counties in Southern Illinois (Greene, Jersey & Madison) directly across the Mississippi River minutes away from the St. Louis, Mo., SMSA. The ethnic demographic characteristics were as follows;

|  |  | Population* |  |  |
| --- | --- | --- | --- | --- |
| Fiscal Year | ILLINOIS | GREENE | JERSEY | MADISON |
| FY 1960 | (Total)10,081.158 | 17,460(99.8%) | 17,023(99.7%) | 224,789(94.6%) |
| FY 2005 | (Total)12,831,970 | 14,255(98.3%) | 22,628(97.9%) | 265,303(90.2%) |

\* The percentages cited reflect the Illinois population of European origin. The total Illinois population in a 45 year period increased by 2,750,812(27.2%).

(Citing **United States Bureau of the Census**, Richard M. Scammon, Director, County & City Data Book, 1962 [A Statistical Abstract Supplement] United States Government Printing Office, Washington 25 D.C. © 1962 Table II: COUNTIES, @ Page 92, United States Department of Commerce, Secretary, Hon. Luther H. Hodges & http://www.census.gov/)

[18] A.) (Former employee's claim of willful violation of 15 U.S.C. § 1681m(a) will not be dismissed, even though employer maintains that it advised employee of adverse criminal record information contained in consumer report provided to it, because statute requires user of consumer report to disclose name and address of reporting agency when employment opportunity is denied, and it is unclear whether such disclosure was made despite fact that employee visited regional office of agency one day after being fired.) Wiggins v District Cablevision (1994, DC Dist Col) 853 F Supp 484.

B.) (Employer's policy of automatically excluding from employment applicants with prior criminal convictions violates prohibition against national origin discrimination in 42 U.S.C. § 2000e-2 when it is applied in southwest United States, statistics revealing that Spanish Surnamed population has disproportionate arrest and conviction percentage in comparison to white population in that area.) EEOC Dec 78-03 (Nov 7, 1977), CCH EEOC Decisions P 6714.

[19] A.) (Dissemination of adverse employment references can constitute violation of Title VII if motivated by discriminatory intent.) Hashimoto v Dalton (1997, CA9 Hawaii) 118 F3d 671, 97 CDOS 5295, 97 Daily Journal DAR 8624, 74 BNA FEP Cas 533, 71 CCH EPD P 44934, cert den (1998) 523 US 1122, 140 L Ed 2d 943, 118 S Ct 1803, 76 BNA FEP Cas 1888 and (criticized in Moore v West (2002, SD Ind) 2002 US Dist LEXIS 4896)

B.) (Employer's consideration of background or 'character' investigation of applicant for employment, including inquiry into credit record, military service record, and the like, as unlawful employment practice violative of Title VII of Civil Rights Act of 1964, as amended ( 42 U.S.C. §§ 2000e et seq.)) 40 ALR Fed 473.

C.) (Employer violated 42 U.S.C. § 2000e-2 by discharging black employee following discovery that employee had extensive criminal record covering span of 18 years and including 4 felony convictions, where intervening time between last conviction and decision to discharge employee was approximately 12 years, and where such employee had excellent work record for past several years and made significant efforts at rehabilitation.) EEOC Dec No. 79-37 (Feb 9, 1979).

D.) Employment decision based on falsification of answer to inquiry into employee's arrest records violates 42 U.S.C. § 2000e-2. EEOC Dec No. 76-53 (Oct 24, 1975).

[20] A.) **Chicago Sun-Times**, 14th February 2007, Vol. LX, No.VII, Founded 7th February 1947, NEWS Section, ONLINE Edition, 'He Would Die For His Uniform', by ANNIE SWEENEY;

B.) **Chicago Sun-Times**, Thursday, 14th June 2007, Vol. LX, No. CXXV, Founded 7th February 1947, NEWS Section, ONLINE Edition, More Charges For Cop Accused Of Thefts, by ERIC HERMAN;

C.) Chicago Sun-Times, Tuesday, 19th June 2007, Vol. LX, No. CXXX, Founded 7th February 1947, NEWS Section, ONLINE Edition, Judge Won't Let Abbate Have Gun, by ERIC HERMAN;

D.) Chicago Sun-Times, Thursday, 27th September 2007, Vol. LX, No. CCXXIX, Founded 7th February 1947, NEWS Section, ONLINE Edition, Cop Charged In Plot To Kill Former Officer, by Fran Spielman, FRANK MAIN, ERIC HERMAN & LISA DONOVAN;

E.) Chicago Sun-Times, Friday, 28th September 2007, Vol. LX, No. CCXXX, Founded 7th February 1947, NEWS Section, ONLINE Edition, Bond Cut In Half For Cop Who Aided Probe, by ERIC HERMAN & FRANK MAIN;

F.) Chicago Sun-Times, Sunday, 7th October 2007, Vol. LX, No. CCXXXIX, Founded 7th February 1947, NEWS Section, ONLINE Edition, Among The Worst, by FRANK MAIN;

G.) Chicago Sun-Times, Wednesday, 10th October 2007, Vol. LX, No. CCXLII, Founded 7th February 1947, NEWS Section, ONLINE Edition, Cops Clean House, by FRANK MAIN, ANNIE SWEENEY & ERIC HERMAN;

H.) Chicago Sun-Times, Wednesday, 10th October 2007, Vol. LX, No. CCXLII, Founded 7th February 1947, NEWS Section, ONLINE Edition, Police Department Disbands SOS, by FRANK MAIN & ANNIE SWEENEY;

I.) Chicago Sun-Times, Thursday, 11th October 2007, Vol. LX, No. CCXLIII, Founded 7th February 1947, NEWS Section, ONLINE Edition, Lawsuit Accuses 4 Discredited Cops Of Illegal Bar Raid, by FRANK MAIN & ANNIE SWEENEY, "Accused dirty cop Jerome Finnigan and three others facing corruption charges were among a group of Special Operations Section officers who conducted an illegal raid on a Southwest Side bar in 2004, a lawsuit said Wednesday. Finnigan and 19 other officers from the unit surged into Caballos and searched patrons without cause, said the suit by bar owner Barbara Heidegger. Finnigan allegedly turned off a security monitor and said they were seeking drugs and guns. Officers allegedly took patrons' cash. They arrested Gregorio Martinez, but prosecutors dropped a drug charge against him when they saw security videotapes that proved the arrest report was falsified, the lawsuit said. Prosecutors gave the tapes to the Internal Affairs Division, which never investigated, said the lawsuit. A police spokeswoman has said the department never saw the tapes. Finnigan, five other SOS officers and a sergeant were charged last year in a series of home invasions, robberies and kidnappings dating to 2002. Finnigan also is charged with trying to kill a former cop serving as a witness against him. The department scrapped SOS on Tuesday. About 100 officers will move into districts or other units. SOS included the SWAT team, whose members were surprised to learn Wednesday they can't remain on the team if they have nine or more complaints against them over a five-year period, sources said.;

J.) Chicago Sun-Times, Sunday, 14th October 2007, Vol. LX, No. CCXLVI, Founded 7th February 1947, NEWS Section, ONLINE Edition, The Cost Of Corruption, by TIM NOVAK & FRAN SPIELMAN;

K.) Chicago Tribune 6th December 2006, Founded 10th June 1847, 160th Year, METRO Section, ONLINE Edition, Fellow Officers Finger Suspected Rogue Cops, by Carlos Sadovi;

L.) Chicago Tribune, Wednesday, 4th April 2007 Founded 10th June 1847, 159th Year, NEWS Section, ONLINE Edition, Officers Who Talked Shielded, by Carlos Sadovi;

M.) Chicago Tribune, Wednesday, 18th July 2007 Founded 10th June 1847, NEWS Section, ONLINE Edition, Elite Cops Rack Up Complaints, by David Heinzmann, Angela Rozas, Gary Washburn, Azam Ahmed & Michael Higgins;

N.) Chicago Tribune, Thursday, 27th September 2007 Founded 10th June 1847, 161st Year, No. CCLXX, NEWS Section, ONLINE Edition, Cop Held In Murder Plot, by David Heinzmann & Todd Lighty;

O.) Chicago Tribune, Friday, 28th September 2007 Founded 10th June 1847, 161st Year, No. CCLXXI, NEWS Section, ONLINE Edition, Bar Tape Refutes Cops, by David Heinzmann & Todd Lighty;

P.) Chicago Tribune, Wednesday 3rd October 2007 Founded 10th June 1847, 161st Year, No. CCLXXVI, NEWS Section, ONLINE Edition, City Withholds List Of Accused Police, by David Heinzmann & Gary Washburn;

Q.) Chicago Tribune, Saturday 6th October 2007 Founded 10th June 1847, 161st Year, No. CCLXXIX, NEWS Section, ONLINE Edition, 3 Cops Taken Off Street, by David Heinzmann;

R.) Chicago Tribune, Wednesday, 10th October 2007 Founded 10th June 1847, 161st Year, No. CCLXXXIII, NEWS Section, ONLINE Edition, Timeline Of Investigations Into SOS Misconduct, by David Heinzmann;

S.) Chicago Tribune, Tuesday, 3rd April 2007 Founded 10th June 1847, 159th Year, NEWS Section, ONLINE Edition, Amid Furor, Cline Resigns, by David Heinzmann & Gary Washburn;

T.) Chicago Tribune, 3rd May 2007 Founded 10th June 1847, 159th Year, NEWS Section, ONLINE Edition, Cop Shook Down Drug Dealers, Prosecutors Say, by Jeff Coen;

U.) Chicago Sun-Times, 08th September 2006, Founded 7th February 1947, NEWS Section, ONLINE Edition, 4 Elite Chicago Cops Arrested, by FRANK MAIN, CAROL MARIN & Stefano Esposito;

V.) Chicago Sun-Times, 07th February 2003, Founded 7th February 1947, NEWS Section, ONLINE Edition, Retired Cop Charged With Stealing Cocaine, by Frank Main & Fran Spielman, @ Page 12;

W.) Chicago Sun-Times, Saturday, 28th January 2006, Founded 7th February 1947, NEWS Section, ONLINE Edition, City To Pay $9 Mil. In Wrongful Conviction, by STEVE PATTERSON;

X.) Chicago Sun-Times, 18th August 2005, Founded 7th February 1947, NEWS Section, ONLINE Edition, 14-Year-Old Details Alleged Attack By Cop: Officer Roughed Her Up, Made Jokes At Her Expense, Girl Says, by Frank Main, @ Page 08;

Y.) Chicago Sun-Times, 14th February 2003, Founded 7th February 1947, NEWS Section, ONLINE Edition, Cop Busted In Protection Money Scheme: Second Officer's Guilty Plea Shines Light On Cocaine Theft, Author Unknown, @ Page 8;

Z.) Chicago Sun-Times, Thursday 07th September 2006, Founded 7th February 1947, NEWS Section, ONLINE Edition, 4 Cops May Have Ruined 100 Cases, by FRANK MAIN & CAROL MARIN,

[21]
A.) (Employer's discharge of employee for criminal record including rape, assault and battery, drunkenness, and at least one firearms offense did not violate 42 U.S.C. § 2000e-2, where such offenses were clearly related to job of utility worker in public auditorium, and where convictions were spread over period of years with most recent conviction occurring approximately 20 months prior to employment application.) EEOC Dec No. 78-35 (June 8, 1978).

B.) (Facts that plaintiff failed to disclose several shoplifting convictions on his employment application, and misstated his reasons for leaving previous job, with employer claim that it would not have hired plaintiff if it had known about such situations, do not necessarily bar plaintiff from recovery on his discrimination claims.) Benitez v Portland Gen. Elec. (1992, DC Or) 58 BNA FEP Cas 1130, 7 BNA IER Cas 918, 140 BNA LRRM 2132, 122 CCH LC P 10312.

C.) (Fact that employer might be exposed to increased expense or administrative burden related to bonding requirements as result of employing person who has arrest record as cashier does not constitute business necessity for policy of rejecting persons who have arrest records.) EEOC Dec No. 76-39 (Sep 30, 1975).

D.) (Employer's policy of refusing to employ persons who had been convicted of violent crimes did not violate prohibition against race discrimination in 42 U.S.C. § 2000e-2, where policy was prompted by rash of violent altercations among employees during working hours on employer's property.) EEOC Decision No. 76-84 (Jan 14, 1976), CCH EEOC Decisions P 6662.

[22]
A.) (It is unlawful to discharge employee for having given false answer to employment conviction-record question.) EEOC Dec No. 72-1460 (1972) CCH EEOC Dec P 6341.

B.) (Employer did not violate 42 U.S.C. § 2000e-2 by failing to hire black applicant, where applicant falsified his application by failing to disclose prior criminal conviction, applicant 'flew off the handle' when later asked about his conviction record, employer had previously hired 10 persons (7 black) who had conviction records, and 33 percent of persons employed in position which black applicant sought were black while 11.5 percent of local population was black.) EEOC Dec No. 76-57 (Oct 24, 1975).

C.) (Employer's nondiscriminatory application of neutral rule which provides for discharge of or failure to hire employee who falsified inquiry concerning his conviction record on employment application is not violation of 42 U.S.C. § 2000e-2.) EEOC Dec No. 80-26 (Sep 11, 1980).

D.) (Employment practice of disqualifying persons from consideration for employment because of their conviction records can be expected to have disproportionate adverse impact upon blacks and to be unlawful under Title VII in absence of justified business necessity; and to establish business necessity employer must demonstrate that nature of particular criminal conviction prevents individual job applicant from performing particular job in acceptable business-like manner.) EEOC Dec No. 81-7 (Nov 12, 1980).

E.) (District Court's finding of no discriminatory impact by employer's policy of rejecting all applicants with criminal convictions, despite fact that statistics showed that policy automatically excluded two and one-half times as many blacks as whites, based on court's conclusion that actual percentage of blacks rejected ( 2.05) was de minimis when compared to percentage of blacks in metropolitan area, was defective, first because comparing number of black applicants rejected to total number of applicants could not reflect disparity of impact separately against each race, and secondly because issue to be examined statistically was whether policy operated in disparate manner upon minority race, not whether individuals actually suffering from discriminatory practice were large in number.) Green v Missouri P. R. Co. (1975, CA8 Mo) 523 F2d 1290, 10 BNA FEP Cas 1409, 11 BNA FEP Cas 658, 10 CCH EPD P 10314, 10 CCH EPD P 10384, 33 ALR Fed 248.

F.) (Employer's policy of automatically excluding from employment applicants with prior criminal convictions violates prohibition against national origin discrimination in 42 U.S.C. § 2000e-2 when it is applied in southwest United States, statistics revealing that Spanish Surnamed population has disproportionate arrest and conviction percentage in comparison to white population in that area.) EEOC Dec 78-03 (Nov 7, 1977), CCH EEOC Decisions P 6714.

G.) (Employer's blanket policy of automatic discharge of employees convicted of crimes discriminated against black employees since blacks are convicted at rates significantly in excess of their percentage in population.) EEOC Dec No. 80-28 (Sept. 17, 1980).

H.) (There was reasonable cause to believe that respondent violated Title VII by failing to look at each applicant's conviction record individually, in that such practice discriminates against blacks as a race, even though it did not discriminate against charging party in particular, since his conviction for 'flourishing a dangerous and deadly weapon' was reasonably related to position of police officer for which he applied.) EEOC Decision No. 77-3 (1976) CCH EEOC Decisions P 6559.

[23]
A.) (Where former employee alleged that her employer fabricated allegations of criminal activity in order to force her to drop her EEOC charge, and charges of criminal activity at workplace could have effectively destroyed former employee's chances of future employment, allegations stated cause of action since employer's conduct arose out of

employment relationship; it would contravene basic purpose of Title VII to permit employer to affect former employee adversely when it could not similarly affect current employee in same manner.) Atkinson v Oliver T. Carr Co. (1986, DC Dist Col) 40 BNA FEP Cas 1041.;

B.) EVELYN J.D. SZYMANSKI, Plaintiff, v. COUNTY OF COOK, Defendant., No. 03 C 7573, UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, 2005 U.S. Dist. LEXIS 32794, 9th December 2005, Decided, 9th December 2005, Filed, "Plaintiff argues that her former employer, Cook County, 'blackballed' or 'blacklisted' her from obtaining employment as a nurse or nurse practitioner at numerous hospitals in the Chicago area by explicitly mentioning her EEOC litigation against Cook County and providing negative references to Plaintiff's potential employers. (Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment, hereinafter 'Plaintiff's Brief,' at 2.) In 1996, the Seventh Circuit recognized that post-termination events are actionable under Title VII. See Veprinsky v. Fluor Daniel, Inc., 87 F.3d 881 (7th Cir. 1996); Ruedlinger v. Jarrett, 106 F.3d 212, 214 (7th Cir. 1997). The following year, the U.S. Supreme Court upheld an expansive reading of the term 'employee' in the statute, finding that former employees are protected from retaliatory action by their former employers under the anti-retaliation provisions of Title VII. Robinson v. Shell Oil Co., 519 U.S. 337, 346, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997). In both Robinson and Veprinsky, plaintiffs alleged that, in retaliation for the filing of EEOC charges, their former employers had provided negative references to potential employers. Robinson, 519 U.S. at 339-40; Veprinsky, 87 F.3d at 894. In Veprinsky, the court concluded that 'the ability to "blacklist" a former employee, and thus foreclose future employment possibilities is but one example of an employer's power to punish a former employee for exercise of her Title VII rights.'" 87 F.3d at 890;

C.) EVELYN J.D. SZYMANSKI, Plaintiff, v. COUNTY OF COOK, Defendant., No. 03 C 7573, UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, 2005 U.S. Dist. LEXIS 32794, 9th December 2005, Decided, 9th December 2005, Filed, "As explained in Stone v. City of Indianapolis, 281 F.3d 640, 644 (7th Cir. 2002), a plaintiff can make out a case of retaliation either by the 'direct method' or the 'indirect method.' See also Rogers v. City of Chicago, 320 F.3d 748, 753 (7th Cir. 2003); Hudson v. Chicago Transit Authority, 375 F.3d 552 (7th Cir. 2004); Mannie v. Potter, 394 F.3d 977, 984 (7th Cir. 2005). In light of the Court's holding in Veprinsky that post-termination retaliation is actionable under the anti-retaliation provisions of Title VII, it follows that post-termination retaliation would follow the same framework that the Seventh Circuit has established for retaliation cases in general. Veprinsky, 87 F.3d at 890;

D.) EVELYN J.D. SZYMANSKI, Plaintiff, v. COUNTY OF COOK, Defendant., No. 03 C 7573, UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, 2005 U.S. Dist. LEXIS 32794, 9th December 2005, Decided, 9th December 2005, Filed, "Instead, to establish retaliation by the 'direct method,' Plaintiff must present either direct or circumstantial evidence of that offense. Direct evidence proves the fact in question 'without reliance on inference or presumption' and 'essentially requires an admission by the decision-maker that his actions were based upon prohibited animus.'"Rogers, 320 F.3d at 753 (citing Walker v. Glickman, 241 F.3d 884, 888 (7th Cir. 2001));

E.) EVELYN J.D. SZYMANSKI, Plaintiff, v. COUNTY OF COOK, Defendant., No. 03 C 7573, UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, 2005 U.S. Dist. LEXIS 32794, 9th December 2005, Decided, 9th December 2005, Filed, "Having concluded that the evidence is insufficient to establish discrimination under the direct method of proof, the court considers whether there is a dispute of fact under the indirect method. Under that method, as set forth in Stone v. City of Indianapolis and its progeny, an employee may establish a prima facie case of retaliation by showing that 'after filing the charge only she, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action.' Hasan v. DOL, 400 F.3d 1001, 1004 (7th Cir. 2005), citing Stone; see also Koszola v. Board of Education, 385 F.3d 1104, 1110 (7th Cir. 2004). The court specifically declined to impose a requirement that plaintiff also prove a causal link between the protected activity and the adverse employment action." 281 F.3d at 642 (citing Miller v. American Family Mutual Ins. Co., 203 F.3d 997, 1007 (7th Cir. 2000).

[24] See E-mail dated Tuesday, 22nd August 2006 at 17:36:08 CST From: P. Vega lasvegas_1999@excite.com To: BLeonard@heartlandalliance.org Cc: LSode@heartlandalliance.org Subject: V.P. of Human Resources
[25] See E-mail dated Wednesday, 14th March 2007 11:18:58 CST From Sid Mohn SMohn@heartlandalliance.org To: lasvegas_1999@excite.com Subject: Regrets, which stated in full,

"Mr. Vega,
I am not able to meet with you. My colleagues have handled all your requests."
[26] See E-mail dated Tuesday, 17th April 2007 at 3:30 PM CST, From: Barbara Weiner <barbaraweiner@att.net, To: lasvegas1999@gmail.com, Subject: See attached letter, which stated in full,

"LAW OFFICES OF BARBARA A. WEINER
513 Central Avenue
5th Floor

13

Highland Park, IL 60035
847-266-2040
barbaraweiner@att.net
April 17, 2007

Mr. Paul Vega
1632 W. Belmont Avenue
Chicago, Il 60657 via lasvegas1999@gmail.com

Dear Mr. Vega:

I am the attorney for Heartland Alliance and Heartland Health Outreach. Both the staff and members of the Board have received and investigated your complaint. I know you are unhappy with the outcome. However, your persistent contacts are viewed as harassment. If you have further complaints you may take this matter up with the Equal Employment Opportunity Commission at 1-800-669-4000. If you attempt to come onto the property of Heartland Alliance, Heartland Health Outreach or the work place or residence of any of its staff or Board members the police will be immediately contacted. Further contacts by mail or telephone will be ignored. Should you engage in further direct contact, then the Agency will take whatever legal actions it can against you. I hope that you will put this matter behind you and move forward with your life. Heartland Alliance and Health Outreach is not prepared to provide you any further services.

Sincerely,
Barbara A. Weiner

c.c. Kelli Spencer"
[27] See E-mail dated Tuesday, 17[th] April 2007 @ 5:49 PM CST, From Paul Vega <lasvegas1999@gmail.com>
To Barbara Weiner <barbaraweiner@att.net>, subject Re: Letter, which stated in full,

"Ms. Weiner:

Please allow for this note to serve as an acknowledgement of being in receipt of your e-mail of 17 April 2007 which included an attachment of what appears to be a note dated 17 April 2007. The front desk receptionist today, indicated that Tami Smith had informed her that a letter was sent to me prior to today advising me of the reasons not to provide me with Board of Director meeting dates or other financial record information pertaining to the operational components of Heartland Alliance. In any regard, thank you for the clarification which you spelled out in the attached note dated 17 April 2007. Ms. Weiner, I would like direct your attention to a simple fact. And that is that I never sought the services of either Heartland Alliance or Heartland Health Outreach. I sought employment with Heartland Alliance and was refused employment in September 2003. And during Q3 2004 to June 2005, I fully came to understand why employment with Heartland Alliance was refused based on information which was brought to my attention at the Bridgeview Bank Building which made this understanding achievable. That said, I did want provide evidence to members of the Board of Directors in the form of some of the teeth that I have lost due to being denied employment with an agency that claims to champion human rights in Illinois. But, please be assured Ms. Weiner I can live without that opportunity. However, I do regret that the Board of Directors will be denied the opportunity to hear first hand of the unethical and unprofessional practices that will lead a person to endure unemployment and as a result lose teeth in the process. Should we forget this and move forward with our lives? I say never again, should we forget this. Trust me, Ms. Weiner, it will be very difficult to move anywhere, be it forward or upward in Illinois when a person is denied employment on a constant basis as I was with the Heartland Alliance. As such, economic leverage can always be used as a weapon against a person or group of people to exert control over them. Not only does financial hardship exerts stress on the bread winner of family unit, this lack of financial freedom will dictate the conditions which that family unit will live under, and subsequently shape the perception of that person or group of people. In light of this, I find it so ironically preposterous that Jack Lavin in his capacity as Executive Director of the Illinois Department of Commerce and Economic Opportunity can stand before close to 100 people at the Spain-USA Investment & Business Cooperation Forum on Monday, 16 April 2007 at 0930 HRS CST at the Mid America Club in the AON Building and sell the idea that, 'doors are open for business' in Illinois and that in Illinois, there are, 'good jobs to raise families'. Who is he kidding? Good jobs for who? And what families have access to these jobs? Please be assured that I am not interested in making contact with anyone at the agency. And I doubt that the agency can take legal action against me. What is there to take? The rest of the teeth I have yet to lose? The remaining assets I have yet to lose? And what police officers are going to be called? The ones who are on trial in Illinois this week or the ones who will be on trial next week in Illinois? The ones who are in the process of being fired this week in Illinois or the ones that will be fired next week in Illinois? I wouldn't want to call them or see them, personally. I doubt anyone wants to see Anthony Abate either today or next week now that he is

unemployed and headed for a tour of the Illinois which not all members of society have access to. Anyway, Ms. Weiner, thank you for the hospitality Heartland Alliance has given to me. I will never forget it. Thank you. God bless.

BEST REGARDS;

P. Vega"

[28] See E-mail dated Wednesday 28th March 2007 @ 21:06:58 CST From P. Vega lasvegas_1999@excite.com To: TSmith@heartlandalliance.org Subject: Mortgage Financing, which stated in full,

"Ms. Smith:

Hi there. Are the questions I have too hard for anyone at Heartland Alliance to reply to? That would not suprise me at all. I do not know how many times I have to constantly repeat myself. I need to finance a mortgage. In order to finance that mortgage, a reliable income is required to qualify for favorable terms from a lender institution, such as the Bridgeview Bank in Uptown. When am I going to see the financing I need to secure from a lender the favorable terms to finance that mortgage? I have had several units since FY 2006 slip out of my hands becuase of lack of access to the financing required to secure the mortgage terms, insurance, etc. I need one of those 80 plus jobs(middle-management) that Heartland Alliance is making available on its web site. Why am I being constantly denied a job with Heartland? This has to stop. This is crazy. I am better qualified than most of the 500 plus currently employed at Heartland, but yet I am constantly refused an offer. We are in March 2007 already. How much longer am I going to be refused employment? What kind of help is this?

P. Vega
603.907.2421"

[29] See E-mail dated Tuesday 20th March 2007 @ 17:37:38 CST, From P. Vega lasvegas_1999@excite.com, To: TSmith@heartlandalliance.org Subject: Mortgage Financing, which stated in part,

"Ms. Smith:

Good Afternoon! In a prior note, Dr. Mohn, told me that he did not want to meet with me to discuss why I have been constantly denied employment with the Heartland Alliance since 3Q FY 2003, even though that the hiring managers making incorrect assessments of my qualifications have themsleves been asked to resign or have been dismissed from employment at Heartland Alliance due to their mental incompetencies since 3Q FY 2003. Do you remember Ms. Smith, when we last met face to face on the 18th Floor of the 208 S. LaSalle building, in the foyer lobby of the Heartland Alliance's Mid-West headquarters which happens to be in the Financial District of the Mid-West as well, do you remember when you told me, 'Heartland helps people find work.' Do you remember that? Do you remember that Ms. Smith? Well guess what? As long as Heartland Alliance becomes dependent on the materials it used to assess my qualifications in 3Q FY 2003, a person will never find work, but will instead be perpetually out of work, out of an income, out of health insurance and out of the ability to finance a mortgage in order to provide for a family. Trust me. That is what will happen to that person."

[30]       A.) (Heartland Alliance engaged in unprofessional deceptive economic deprivation of 98 vouchers and other economic resources against a group of low-income minority renters Heartland Alliance was awarded a HUD grant to house) SANDRA ANN CHAMBERS, individually, in her official capacity as president of Sutherland Tenants Council (STC), and on behalf of all others similarly situated in the past, present, and future, ANGELA CHAMBERS, individually and on behalf of all others similarly situated in the past, present, and future, Plaintiffs, v. HOLSTEN MANAGEMENT CORPORATION, CENTURY PLACE DEVELOPMENT, HEARTLAND ALLIANCE, CHICAGO CONNECTIONS, TRAVELERS & IMMIGRANTS AID, SID MOHN, PETER HOLSTEN, STEVE JOHNSON, LARRY HOWARD BENJAMIN CLARK and SARAH DART, Defendants, No. 02 C 5154 , UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, 2004 U.S. Dist. LEXIS 5051, 24th March 2004, Decided, 25th March 2004, Docketed;

      B.) (Heartland Alliance engaged in unprofessional deceptive medical/health malpractice against low-income HIV African refugees in which Heartland Alliance was awarded reimbursement payments from the United States Department of Health & Human Services Center For Medicare & Medicaid Services to perform as a health-care provider) INNOCENT LIKONGA KASONGO, Individually and as Special Administrator of the Estate of JACQUELINE MAKOMBE, Deceased, Plaintiff, v. UNITED STATES OF AMERICA, Defendant, No. 04 C 4901, UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, 2007 U.S. Dist. LEXIS 51141, 16th July 2007, Decided, 16th July 2007, Filed

[31] See http://www.heartlandalliance.org/maip/documents/2007PovertyReportFINAL_000.pdf @ Page 1
[32] See email dated Wednesday 14th March 2007 @ 13:13:08 CST, From: P. Vega lasvegas_1999@excite.com To: SMohn@heartlandalliance.org Subject: Human Rights In Illinois which stated in full,

"Dear Dr. Mohn:

Dr. Mohn, I am sorry but I must disagree with your assertion that your colleagues have handled any requests I have made to them.

1.) I have never made any request to your colleagues. Perhaps I may have communicated or pointed out certain paradoxes with your colleagues, but I have never requested anything of your colleagues, other than for the production of the material that was used by the HR Department in Q4 FY 2003 to make a determination on my qualifications for a position that was posted in Q3 FY 2003.

2.) That material in question which was used by the HR Department to make a determination on my qualifications has never been produced to me, even after I have repeatedly asked for it since Q3 FY 2003.

3.) Since the Leadership Team at Heartland Alliance makes policy that has a direct impact on the functionality of the 68 programs or so, give or take a grant approval or denial here or there, it would not be consistent to publicly pronounce that Heartland Alliance protects or advocates Human Rights in Illinois, when all we simply need to look at is the manner in which I have been denied employment with Heartland Alliance, especially when those making the hiring assessments themselves have been asked to resign or have been dismissed due to mental incompetencies.

Dr. Mohn, I am better qualified than most at the Heartland Alliance, and that is a threat to those who are not as qaulified as I am. And it should be, because as I have maintained, I would clean house at Heartland Alliance. But since I am not employed in a capacity of Inspector General, there is no need for me to devote energy to that endeavor. However, the fact remains that I have been denied employment time in and time out by Heartland Alliance because of the improper judgements of hiring managers who are clueless to what they are doing, hiring managers that should not have been hired in the first place as hiring managers or promoted to hiring manager, but hiring managers that have been asked to resign or have been dismissed due to their mental incompetencies. So where are my human rights in Illinois, Dr. Mohn? Where is the health insurance I need? Where is the income I need? Where is the mortgage financing I need? Where is the dental treatment I need? These are questions that only qualified compentent professionals will be able to address. And no one at Heartland Alliance has been able to address these questions on a satisfactory basis, sad but true, Dr. Mohn. I can only come to the conclusion, that even after asking repeatedly for financial assistance from the Heartland Alliance in the form of employment, health insurance, mortgage financing, even though that the Heartland Alliance claims to society that, *'Poverty and economic hardship deprive individuals of their human rights.'* (Heartland Alliance 2007 Poverty Report, Introduction @ Page 1), it could safely be argued that Heartland Alliance has contributed to economic hardship by restricting and limiting my chances and opportunities in Illinois. The same chances and opportunities that Heartland Allinace claims are violations of human rights in Illinois. (Heartland Alliance 2007 Poverty Report, Introduction @ Page 1, *'Poverty......limits people's chances and restricts opportunity — all of which are violations of human rights.'*) So, thank you for violating my human rights in Illinois by denying me the financial assistance I need (without telling me why I have been denied employment) to put a roof over a family's head, or clothe children, and provide nutritious meals. Thank you so much for helping me in that manner since Q3 FY 2003 and especially from Q3 FY 2004 to June 2005. Heartland Alliance is a wonderful model and every human rights organization which claims a 503(c)(1) in Illinois should follow her example. This is such great news that the Heartland Alliance Board should be made aware of this fabulous discovery. By the way, Dr. Mohn, when does the body noted in the prior sentence meet again? I would like to share this story with them.

Best Regards;

P. Vega
603-907-2421"
[33] NOTE: The following points were made by Mrs. Devata, J.D. during her presentation:
   1.) In FY 2000, 1.8 Million employment seekers during background checks revealed that 6% held a criminal history within a 7 year period, 24% lied about work or education, 28% had poor credit records, & 35% held one or more moving violations, DUI or license suspensions;
   2.) In FY 1992, 21,300 assaults and acts of violence occurred in workplace environments which resulted in fatalities, injuries and days off that measured $4.2 Billion.
   3.) Workplace violence is the second leading cause of on-the-job death in the United States.
   4.) Nearly $400 Billion annually is stolen by employees from U.S. business. The average yearly gross revenue loss a company sustains from employee dishonesty and fraud is 6%.
   5.) 79% of all employees will steal from their employers and a 3[rd] of businesses will dissolve due to employee theft.

6.) Under the Fair Credit Reporting Act, any potential employee can be screened for employment purposes by an end-user with the aid of a consumer report. However, any entity using such for employment purposes must certify to the Consumer Reporting Agency that such entity will distribute the required written disclosure and obtain the required written authorization from the employment applicant, and that the information obtained from the Consumer Reporting Agency will not be used by the end-user in violation of any laws or regulations and of course that the end-user will comply with adverse action requirements.

7.) Adverse Action is any action that is taken against the employment interest of a candidate seeking a particular position. Accordingly before any such adverse action is taken against the employment interest of a candidate seeking a particular position, the end-user must provide the candidate seeking a particular position with a copy of the materials accessed from the Consumer Reporting Agency and must also provide the candidate seeking a particular position with a summary of the consumer's rights under the Fair Credit Reporting Act.

8.) If after obtaining the materials accessed from the Consumer Reporting Agency and reviewing such, the end-user decides to take adverse action against the employment interest of a candidate seeking a particular position due to the possible existence of graphic subject content contained within the materials accessed by the end-user from the Consumer Reporting Agency, the end-user must provide the candidate seeking a particular position with a notice of the adverse action taken, the end-user must provide the candidate seeking a particular position the contact information of the Consumer Reporting Agency which supplied the materials accessed, the end-user must provide the candidate seeking a particular position a statement that the Consumer Reporting Agency did not approve, initiate or decide the adverse action in question and is unable to speculate as to why the adverse action was under taken by the end-user, the end-user must provide the candidate seeking a particular position a notice that the candidate seeking a particular position has a right to obtain a free copy of the materials accessed from the Consumer Reporting Agency by the end-user within a 60 day period tolling the date in which the end-user provided the candidate seeking a particular position with the notice of the adverse action taken by the end-user, and the end-user must provide the candidate seeking a particular position a notice of his or her right to dispute the accuracy or completeness of any graphic subject content contained within the materials accessed by the end-user from the Consumer Reporting Agency.

9.) Mrs. Devata further argued that in Illinois adverse action liability may result if a candidate seeking a particular position has adverse action taken against him or her by an end-user or HR Department not complying with the provisions cited above within the Fair Credit Reporting Act such as the end-user or HR Department not providing the candidate seeking a particular position with a copy of the materials accessed by the end-user or HR Department in the process of *evaluating a consumer for employment, promotion, reassignment or retention as an employee,'* (15 U.S.C. § 1681a(h)) which is used by the end-user or HR Department to deny employment to a candidate seeking a particular position and by the end-user also not providing to the candidate seeking a particular position with a 'Summary of Consumer Rights' pending the execution of the adverse action and/or after the adverse action is executed by the end-user or HR Department.

[34] HARRIET RIZZO, Plaintiff, v. MICHAEL F. SHEAHAN, in his official capacity as Sheriff, of Cook County, Illinois, Defendant., Case No. 97 C 3995, UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, 2000 U.S. Dist. LEXIS 7159, 22nd May 2000, Decided, 23rd May 2000, Docketed, "The Supreme Court has held that an adverse employment action is a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.' *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 2268, 141 L. Ed. 2d 633 (1998) (citing *Crady v. Liberty Nat. Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993)) (stating '[a] materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'). An adverse action is something more than 'a mere inconvenience or an alteration of job responsibilities.' *Crady*, 993 F.2d at 136; *see also Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996) (stating 'not everything that makes an employee unhappy is an actionable adverse action .') Treatment that has 'little or no effect on an employee's job' does not constitute retaliation. *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998) Rather, the alleged conduct must have some 'tangible job consequence.'" *Id*.

[35]    A.) (Damages for emotional distress are recoverable under FCRA.) Dalton v Capital Associated Indus. (2001, CA4 NC) 257 F3d 409, 17 BNA IER Cas 1313

(B) (Although plaintiff in action under 15 U.S.C. § 1681n suffered no lost wages and incurred no medical expenses, plaintiff would be awarded actual damages of $ 2,500 by reason of his having suffered mental anguish and having had symptoms of sleeplessness and nervousness, and because of repeated and numerous occasions on which plaintiff had to contact defendant, in many cases having to leave his employment for meetings on account of defendant's actions; plaintiff would also be awarded punitive damages of $ 25,000 and attorneys' fees of $ 12,500, and costs would be assessed against defendant.) Millstone v O'Hanlon Reports, Inc. (1974, ED Mo) 383 F Supp 269, affd (1976, CA8 Mo) 528 F2d 829.

(C) (Humiliation and mental distress constitute recoverable elements of damage under Consumer Credit Reporting Act, 15 U.S.C. §§ 1681) Swoager v Credit Bureau of Greater St. Petersburg (1985, MD Fla) 608 F Supp 972.

(D) (Humiliation and distress can constitute actual damages under Act, even if consumer has suffered no out-of-pocket losses.) Washington v CSC Credit Servs. (1998, ED La) 178 FRD 95, 41 FR Serv 3d 136, reconsideration den, amd on other grounds, class certif gr (1998, ED La) 180 FRD 309, revd, in part, vacated, in part, remanded (2000, CA5 La) 199 F3d 263, 45 FR Serv 3d 689, cert den (2000) 530 US 1261, 147 L Ed 2d 983, 120 S Ct 2718.

(E) (Punitive damages may be awarded for violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681 pursuant to 15 U.S.C. § 1681n(a)(2), even in absence of actual damages, where defendant acted under circumstances amounting to willful or wanton disregard of plaintiff's rights; attorney retained by credit union who induced credit union to obtain credit report on attorney's ex-husband in violation of Act could be liable to indemnify credit union for damages where circumstances indicated that attorney was active or primary wrongdoer, and that credit union was passive or secondary wrongdoer.) Yohay v Alexandria Employees Credit Union, Inc. (1987, CA4 Va) 827 F2d 967, 23 Fed Rules Evid Serv 1147 superseded by statute as stated in Ausherman v Bank of Am. Corp. (2003, CA4 Md) 352 F3d 896

(F) (To justify award of punitive damages, defendant's actions must be on same order as willful concealments or misrepresentations; thus, if plaintiff can prove that credit reporting agency adopted its reinvestigation policy either knowing that policy to be in contravention of rights possessed by consumers pursuant to Act or in reckless disregard of whether policy contravened those rights, punitive damages may be awarded.) Cushman v Trans Union Corp. (1997, CA3 Pa) 115 F3d 220.

(G) (Punitive damages awarded under 15 U.S.C. § 1681n for noncompliance with provisions of Fair Credit Reporting Act, 15 U.S.C. §§ 1681 are within discretion of court and malice or evil motive need not be found for such award, but violation must have been willful.) Thornton v Equifax, Inc. (1980, CA8 Ark) 619 F2d 700, cert den (1980) 449 US 835, 66 L Ed 2d 41, 101 S Ct 108.

(H) (Malice or evil motive need not be established for punitive damages award; however, violation must have been willful.) Cousin v Trans Union Corp. (2001, CA5 Miss) 246 F3d 359, reh, en banc, den (2001, CA5 Miss) 254 F3d 72 and cert den (2001) 534 US 951, 151 L Ed 2d 261, 122 S Ct 346.

[36] Mother Jones, August 2002, Vol. XXVII, No. IV, Disorders Made To Order, by Brendan I. Koerner, @ Page 58, "Published by the American Psychiatric association since the 1950's the DSM is designed to give doctors and scientists a common set of criteria to describe mental conditions. Entries are often influenced by cultural norms (until 1973, homosexuality was listed as a mental disorder) and political compromise: The manual is written by committees of mental health professionals who debate, sometimes heatedly, whether to include specific disorders."; http://www.traditionalvalues.org/pdf_files/APAHomosexualUrbanLegend.pdf; Australian and New Zealand Journal of Psychiatry December 2003, Vol. XXXVII, No. VI, The 1973 Deletion Of Homosexuality As A Psychiatric Disorder, by Michael Kirby @ Page 674-677;
NOTE I: In 1973 the American Psychiatric Association (APA) removed homosexuality as a disorder from the Sexual Deviancy section of the Diagnostic and Statistical Manual of Mental Disorders, the DSM-II. The World Health Organization's ICD-9 (1977) listed homosexuality as a mental illness, and in 1990, a resolution was adopted to remove it in the ICD-10 (1993). The ICD-10 added ego-dystonic sexual orientation to the list, which refers to people who want to change their gender identities or sexual orientation because of a psychological or behavioral disorder. The ICD-11 is in progress and should be completed no later than FY 2011.
NOTE II: Freedman, Alfred M, (2000-09-01), Recalling APA's Historic Step, APA News, <http://www.psych.org/pnews/00-09-01/recalling.html>. Retrieved on 2007-05-04; Shoffman, Marc (2006-05-17), Homophobic Stigma - A Community Cause, PinkNews.co.uk, <http://www.pinknews.co.uk/news/articles/2005-1496.html>. Retrieved on 2007-05-04; http://www.who.int/classifications/apps/icd/icd10online/?gf60.htm+f661
[37] E D I T O R I A L, HOMOSEXUALITY & THE INTERNATIONAL CLASSIFICATION OF DISEASES, Dr. Ruy Laurenti, M.D., Professor of the Department of Epidemiology of the Faculdade de Saúde Pública da Universidade de São Paulo (FSP/USP) and Director of the Brazilian Center for the Classification of Diseases (Center of WHO for International Classification of Diseases) FSP/USP., Revista de Saude Publica, V. XVIII, N. V, October 1984
[38] (A sweeping disqualification for employment based solely on past behavior--such as presence of criminal conviction on applicant's record--can violate Title VII if it has disproportionate racial impact and rests upon tenuous or insubstantial basis; employer's reasons for claiming that its policy was business necessity, consisting of (1) fear of cargo theft, (2) handling company funds, (3) bonding qualifications, (4) possible impeachment of employee as witness, (5) possible liability for hiring persons with known violent tendencies, (6) employment disruption caused by recidivism, and (7) alleged lack of moral character of persons with convictions, would all be rejected since company had not empirically validated its policy with respect to conviction records nor shown that less restrictive alternative with lesser racial impact would not serve as well.) Green v Missouri P. R. Co. (1975, CA8 Mo) 523 F2d 1290, 10 BNA FEP Cas 1409, 11 BNA FEP Cas 658, 10 CCH EPD P 10314, 10 CCH EPD P 10384, 33 ALR Fed 248.
[39] A.) Chicago Tribune, 15th August 2006, Founded 10th June 1847, 159th Year, NEWS Section, ONLINE Edition, Witnesses Recall Cabbie's Slaying, by Carlos Sadovi, "Jackson was a policy and communication specialist at the Public Health Department's sexually transmitted disease/HIV/AIDS division. In 1992 he established the Hearts Foundation, a

non-profit organization that describes itself as supporting Chicago's gay and lesbian community. He was fired after his arrest. Jackson, who is HIV positive, was charged in April 2005 in DuPage County with reckless assault for allegedly spitting on a nurse at Advocate Good Samaritan Hospital in Downers Grove. At the time, Jackson was free on $750,000 bail for the murder charge. He has also been charged with reckless conduct for allegedly having sexual contact with inmates in the DuPage County Jail without disclosing that he is HIV positive. The trial is expected to continue on Wednesday."

B.) Chicago Sun-Times, 22nd August 2006, Founded 7th February 1947, NEWS Section, ONLINE Edition, Ex-Health Official Convicted Of Killing Cabbie, by MAUREEN O'DONNELL, & Rummana Hussain;

C.) Chicago Sun-Times, 14th April 2005, Founded 7th February 1947, News Section, ONLINE Edition, Murder Suspect Charged With Assault: Man Accused Of Killing Cabbie Threatened To Infect Nurse, Cops Say, by Stefano Esposito & Annie Sweeney, @ Page 03, "When Michael L. Jackson spoke to a close friend Friday, he talked about his relief at being released from jail a day earlier, the joy of a good meal and his hope that he'd beat charges he murdered a Chicago cabdriver. Two days later, Jackson overdosed on pills and woke up angry in a west suburban hospital, then became immediately combative, swinging at a nurse and threatening to infect her with HIV, police said. The 46-year-old nurse at Good Samaritan Hospital was not hurt, but Jackson was charged in DuPage County with aggravated assault and reckless conduct. Meanwhile, prosecutors in Cook County filed a motion Wednesday to increase Jackson's $750,000 bail because of the new charges. Friends of Jackson, a former official in the Chicago Health Department, had expressed shock in February when Jackson's troubles began with his arrest on a murder charge. He is accused of running over Chicago cabbie Haroon Paryani, 61, three times in a dispute over a fare..........Bauer said Jackson had been staying with his boyfriend in Lombard since he was released from Cook County Jail last week. Jackson had been held without bail since he was charged in the February incident............Bauer said Jackson did not say anything Friday that alarmed him and sounded hopeful about the future................Jackson, 37, arrived at Good Samaritan in Downer's Grove late Sunday morning after swallowing 'large amounts of Xanax and Ambien,' according to a Downer's Grove police report. His boyfriend found him, Bauer said. When he awoke in the emergency room, Jackson tried to get out of bed three times, the report says. The nurse told him he needed medical attention and to lie back down. Jackson tried twice to punch the nurse, but she managed to move out of the way. 'Mr. Jackson then turned his head toward her face, and stated, "And here's some HIV for you, you bitch!" and spit bloody saliva in her direction,' according to the report. The staff knew Jackson was HIV positive and so the nurse quickly got out of his way, the report said. Security guards moved in and restrained Jackson, the report states."

D.) Chicago Tribune, Tuesday, 29th August 2006, Founded 10th June 1847, 159th Year, NEWS Section, ONLINE Edition, Lawyer Admits He Had Child Porn, Author Unknown, "A McHenry County attorney who was arrested in 2004 after authorities found child pornography in his law office was put on probation for 30 months Monday in a plea deal. John Roth, 47, pleaded guilty in Lake County Circuit Court to three counts of possession of child pornography after pornographic movies were seized at his office on North Front Street in McHenry in April 2004. Roth's arrest was part of a worldwide sting initiated by the federal Immigration and Customs Enforcement agency, said Lake County State's Attorney Patricia Fix. Roth had visited Web sites that tipped off authorities that he was involved in child pornography. In exchange for his guilty plea, other counts of possession were dismissed. Although Roth was arrested in McHenry County, he was prosecuted in Lake County because of his ties to McHenry County officials. Roth represented municipalities in McHenry County and worked as a prosecutor for some of them."

E.) Chicago Tribune, 11th January 2007, Founded 10th June 1847, 159th Year, NEWS Section, ONLINE Edition, Doctor Admits To Indecency Charges, by Dave Wischnowsky, "A neurologist accused of exposing himself to teenage girls last summer in a Wilmette park pleaded guilty Wednesday to two misdemeanor counts of public indecency and disorderly conduct. Dr. Jeffrey I. Frank, 45, of the 0-99 block of Kings Cross Drive, Lincolnshire, was ordered to undergo counseling and stay away from parks, beaches, schools and other places where minors gather. Frank may attend functions at his children's schools, said Cook County Circuit Judge Consuelo Bedoya-Witt. He also may coach his son in youth sports but only if another adult is present. On Wednesday, Frank was put under court supervision until Dec. 24, 2008, and his 364-day jail sentence will be suspended as long as he fulfills requirements placed on him by the court, Bedoya-Witt said. Frank also was ordered to undergo a sex-offender evaluation and have a doctor determine whether he needs medication to combat depression and anxiety. 'I want to make sure, Dr. Frank, that we cover all your bases,' Bedoya-Witt said. Frank, a father of two, is the director of neuromedical and neurosurgical intensive care at the University of Chicago Hospitals and a professor of neurology and surgery. According to the hospital's Web site, Frank is an internationally recognized leader in the field of neurointensive care and cerebrovascular neurology and the architect of one of the most reputable neurointensive-care programs in the country. His primary research is related to life-threatening brain swelling after stroke. Frank's medical license has been suspended indefinitely by the state since Aug. 25. He is on a leave of absence from the hospital, a spokeswoman said. Frank has the right to a hearing on the suspension of his license, state spokeswoman Susan Hofer said. No hearing had been scheduled, she said. About 5:45 p.m. July 28, Wilmette police said, four girls ages 15 to 17 saw a man masturbating in the nude near the tennis courts at Gillson Park. They called police, but by the time officers arrived, the man was gone, authorities said. About 3 p.m. Aug. 9, five 13- and 14-year-old girls said they saw a man doing the same thing while seated on a beach towel, according to police. The teenagers told him that they were calling police, and the man put on a pair of shorts and ran, authorities said. The girls chased him to a nearby beach parking lot but lost sight of him, police said.

Officers soon found Frank hiding on the floor of his sport-utility vehicle. Frank was arrested and identified by the girls, prosecutors said. He gave police a written confession and admitted that he was also the man from the July 28 incident. Frank told investigators that he had been under a lot of stress, according to a police report. Accompanied by his wife in a Skokie courtroom Wednesday, Frank listened as Bedoya-Witt delivered both a lecture and words of encouragement. 'This has been a very challenging case for this court in trying to balance the equation of the help you need along with protecting public safety,' Bedoya-Witt said. 'And while also weighing the benefits of your profession and what you've done for society.' Nothing could cause me more pain than for you to not complete your rehab and that society be robbed of your skills because this court has to sign an order to send you to jail for a year. ... I think the time has come for you to stop surviving and to start living." (NOTE: Illinois Department of Financial & Professional Regulation, Division of Professional Regulation, NEWS-Press Release, MEDICAL Section, by Susan Hofer, Phone: 312.814.8197, Web site: www.idfpr.com, SPRINGFIELD, IL, "The Illinois Department of Financial and Professional Regulation (IDFPR) announced today that the Director of the Division of Professional Regulation, Daniel E. Bluthardt, signed the following disciplinary actions taken during the month of August 2006, Jeffrey I. Frank, Chicago physician and surgeon and controlled substance licenses (036075689 & 336039021) temporarily suspended after being arrested for disorderly conduct and public indecency on August 9, 2006.")

 F.) Chicago Tribune, Thursday, 01st December 2005, Founded 10th June 1847, 157th Year, NEWS Section, ONLINE Edition, Segal Gets Rebuke, 10 Years, by Michael Higgins,

 G.) Chicago Tribune Tuesday, 23rd May 2000, Founded 10th June 1847, 151st Year, Metro Chicago Section, ONLINE Edition, COLLEGE ADMINISTRATOR CAUGHT IN SEX STING, Author Unknown, @ Page 3,

 H.) Chicago Tribune, Thursday, 01st December 2005, Founded 10th June 1847, 157th Year, METRO Section, ONLINE Edition, Ex-Principal Indicted Over Use Of Funds, by Courtney Flynn

 I.) Chicago Tribune, Sunday, 7th November 1999, Founded 10th June 1847, 149th Year, NEWS Section, ONLINE Edition, DENTIST CHARGED IN NET SEX STING, Author Unknown,

 J.) Chicago Tribune, 21st August 2006, Founded 10th June 1847, 158th Year, NEWS Section, ONLINE Edition, Man-Boy Love Association Member Stung By FBI, By Matt O'Connor,

 K.) The Jerusalem Post, 31st January 2000, NEWS Section, ONLINE Edition, Cantor Charged In Prostitution Ring, Author Unknown,

 L.) Chicago Sun Times, Wednesday, 23rd November 2005, NEWS Section, ONLINE Edition, Pediatrician Gets 5 Years For Child Porn Collection: Judge Imposes Minimum Sentence, Calls Him 'Good Person', by Rummana Hussain, @ Page 16,

 M.) Chicago Tribune, Friday, 20th April 2007 Founded 10th June 1847, 159th Year, NEWS Section, ONLINE Edition, Bail Is Lowered For Man Held In Restroom Taping, Author Unknown,

 N.) Chicago Tribune, 25th January 1989, Founded 10th June 1847, 139th Year, CHICAGOLAND Section, ONLINE Edition, PROFESSOR, SON INDICTED IN ABUSE, Author Unknown, @ Page 3, "A professor at Northeastern Illinois University and his son were indicted Tuesday on charges they sexually molested the son's two stepchildren while his wife was at work. Bernard Brommel, 58, a professor of speech and performing arts who lives at 412 W. Melrose St., and his son, Bradley Brommel, 26, a laborer, allegedly sexually assaulted and abused the younger Brommel's 5-year- old stepson and 7-year-old stepdaughter at his residence at 4953 N. Kedvale Ave. for more than a year, according to a spokeswoman for State's Atty. Richard M. Daley."

[40] Milwaukee Journal Sentinel, 29th November 2007, NEWS Section, ONLINE Edition, Mom Arrested In Sex Case, by ANNYSA JOHNSON & Derrick Nunnally, "A 58-year-old Walworth County woman was arrested Thursday on suspicion of molesting her daughter 22 years ago with a now-disbarred lawyer who is in jail awaiting trial on charges of sexual assault and child pornography, a Milwaukee Police Department official said. The woman - who is not being identified because she has not been charged - is the unnamed mother in a criminal complaint filed Oct. 23 against Joseph Hallows, 69, of Wauwatosa, who police say kept detailed journals documenting his sexual encounters with adults and children over a 30-year period. The complaint charges Hallows with first-degree sexual assault. He is accused of having the woman's daughter touch him indecently in the bathroom of his Milwaukee law office in January 1985, when the girl was 8. The complaint also says a diary seized in a raid of Hallows' home in 2006 included entries 'detailing various sexually inappropriate activities' involving Hallows and the girl, sometimes including her mother. The victim is now 31. The mother was a client of Hallows during a custody dispute, her ex-husband said Thursday. He said he never suspected his daughter was being molested and learned of it only after police began investigating Hallows. Police arrested the woman, a longtime employee of the Journal Sentinel, in Waukesha, a day before her retirement took effect."

[41] New York Post, 13th March 2007, Founded 15th November 1801, Vol. CCVI, No. CLXIX, NEWS Section, ONLINE Edition, FLAGRANTE DE-DIPLO - ISRAEL AXES NAKED AMBASSADOR, by ANDY SOLTIS, @ Page 20, "Israel's ambassador was ordered home from El Salvador after he was found naked, bound and drunk in the garden of his official residence - with sado-masochistic sex toys around, officials said yesterday. The Foreign Ministry said U.S.-born Tsuriel Rafael - who couldn't identify himself to police until a red bondage ball was removed from his mouth - would be replaced as soon as possible."The ministry sees his behavior as unbecoming of a diplomat," a spokeswoman said.The incident happened in San Salvador two weeks ago but was reported in the Israeli media as a criminal attack on an unidentified Israeli

ambassador in Latin America. No details were given. Concerned members of El Salvador's Jewish community learned the incident involved Rafael, and became suspicious because no police report was filed. It turned out that the Salvadoran police responsible for guarding his residence had found the nude Rafael in the yard, wearing sexual bondage equipment. After he was untied and the ball was removed from his mouth, he told police he was the ambassador of Israel. The Foreign Ministry insisted yesterday it immediately ordered him home. "As soon as the episode was brought to attention of the Foreign Ministry it reacted and the ambassador was recalled to Israel. He is going to remain in Israel," the spokeswoman said. But there was evidence Rafael, a 26-year veteran of the diplomatic corps, convinced his superiors to allow him to stay in office as long as his indiscretion remained confidential. However, yesterday details were leaked to the Israeli newspaper Maariv. It reported the incident but didn't identify the diplomat or the country involved. Within hours Rafael's identity was leaked to Israeli radio and the scandal heated up. Foreign Ministry spokeswoman Zehavit Ben-Hillel said the reports were accurate. She said Rafael did not break any laws. The fate of his career was unclear. Rafael, who was born in America in 1952 and emigrated to Israel in 1971, had served for six months as the ambassador in El Salvador. He allegedly was involved in a previous incident when he was found drunk in his residence."

[42]    A.) **The State Journal-Register,** Tuesday 21st November 2006, Founded 10th November 1831, Vol. CLXXVI, NEWS Section, ONLINE Edition, Brauer, Poe Push For State Pay Hikes, by ADRIANA COLINDRES;

B.) **The State Journal Register,** Saturday, 30th December 2006, Founded 10th November 1831, Vol. CLXXVI, Issue 51, NEWS Section, ONLINE Edition, Raises Planned For State's Merit Comp Workers, by MIKE RAMSEY;

C.) **The Peoria Journal Star** Tuesday, 06th December 2005; Founded 17th December 1855, Vol. CL, NEWS Section, ONLINE Edition, Governor Hands Out Pay Raises, by Doug Finke;

D.) **REDEYE,** 16th November 2005, Founded 30th October 2002, 3rd Year, NEWS Section, ONLINE Edition, Jobs For Votes: Ex-City Official Pleads Guilty In Patronage Hiring Case, Author Unknown;

E.) **Chicago Tribune** 23rd September 1992, Founded 10th June 1847, CHICAGOLAND Section, ONLINE Edition, SHERIFF TEST OFFICIAL GETS 10 MONTHS FOR BRIBES, by Matt O'Connor, @ Page 2;

F.) **Chicago Tribune,** 28th November 2006, Founded 10th June 1847, NEWS Section, ONLINE Edition, State Must Return $7.7 Million In Federal Funds For Job Program, Author Unknown;

G.) **Chicago Tribune,** Saturday, 17th November 2007 Founded 10th June 1847, 161st Year, No. CCCXXI, NEWS Section, ONLINE Edition, Rep. Rush's Son Accused Of Official Misconduct, by Clifford Ward;

H.) **The Peoria Journal Star,** Tuesday, 2nd October 2007, Founded 17th December 1855, Vol. CLI, Issue CCCVII, LOCAL & STATE Section, ONLINE Edition, Rush's Son Fired After Allegations Of Sex With Inmates, Author Unknown;

I.) **Chicago Sun-Times,** Monday, 12th November 2007, Vol. LX, No. CCLXXV, Founded 7th February 1947, NEWS Section, ONLINE Edition, 'I'm Just An Everyday, Working Guy', by DAVE MCKINNEY, CHRIS FUSCO & CAROL MARIN

[43]    A.) **ROCKFORD REGISTER STAR,** Tuesday, 27th November 2007, Founded 20th March 1855, Vol. CLIV, Issue CCCXLVII, NEWS Section, ONLINE Edition, Chicago-Area Police Welcome Federal Help In Fighting Gangs, Author Unknown

B.) **Punishment & Society,** July 2002, Vol. 4, No. 3, Race, Crime, & For Profit Imprisonment Social Disorganization As Market Opportunity, Dr. MICHAEL HALLETT, Ph.D., Associate Professor of Criminal Justice at the University of North Florida, Director of the Graduate Program in Criminal Justice, @ Pages 369-393, @ 371, "A disproportionate number of the offenders sent to prison during this time of dramatic increase were inner-city minority males incarcerated for non-violent drug crimes. This is a pattern that continues today."

C.) **Journal Of Contemporary Criminal Justice,** May 2005, Vol. 21, No. 2, The Global Impact Of Gangs, by Dr. John M. Hagedorn, Ph.D., Professor of Criminal Jusitce at the University of Illinois at Chicago Department of Criminal Justice, @ Pages 153-169, @ 155, "Gangs did not originate in the United States. Dickens and others described London gangs long before their American cousins existed (Pearson, 1983). Even female gang members—scuttlers—may have roamed Manchester in the 19[th] century (Davies, 1998). Gangs have formed all over the world whenever and wherever industrialization and related processes drive people into cities."

D.) **Chicago Tribune,** Friday, 14th July 2006, Founded 10th June 1847, 159th Year, NEWS Section, ONLINE Edition, Police Departments Meet To Curb Gangs, Author Unknown,

E.) **Chicago Tribune,** 28th October 2002, Founded 10th June 1847, METRO Section, ONLINE Edition, Poverty Dogs Black Ex-Inmates, Study Finds, by Ray Quintanilla

[44]    A.) **POLITICAL ECONOMY,** by Robert Ellis Thompson, M.A. Professor of Social Science at the University of Pennsylvania, Member of the American Philosophical Society, Published by Porter & Coates, Philadelphia, © 1882, Chapter VII, THE NATIONAL ECONOMY OF LABOR, § CXIX, @ Page 119, "The lowest wages that you can get a man to live on, will not get the best work out of him. Put a whole people on such wages, and keep them there-if you can-for two or three generations, and you will have crushed the energy, the spirit, the heart out of that people and made them a very inferior and unprofitable class of workmen. You will have taken away from the great mass of them the means of advancing in

intelligence; their physical character will have deteriorated greatly; their social morality-- their good-will and public spirit and ready helpfulness and brotherly feeling-will have been pretty thoroughly eliminated."

B.) POLITICAL ECONOMY, by Robert Ellis Thompson, M.A. Professor of Social Science at the University of Pennsylvania, Member of the American Philosophical Society, Published by Porter & Coates, Philadelphia, © 1882, Chapter VII, THE NATIONAL ECONOMY OF LABOR, § CXXI, @ Page 121, "A southern slaveholder told Frederick Law Olmstead: 'In working niggers we must always calculate that they will not labor at all except to avoid punishment, and they will never do more than just enough to save themselves from being punished and no amount of punishment will prevent their working carelessly and indifferently.'"(Citing THE SLAVE POWER, by Professor John Elliott Cairnes, LL.D., Professor of Jurisprudence and Political Economy at Queen's College Galway, Professor of Political Economy at University College London, 1ˢᵗ Edition, © 1862, LONDON & CAMBRIDGE: Published by Macmillian & Company, Chapter II, The Economic Basis Of Slavery, @ Page 33)

C.) THE SOCIAL SYSTEM, by John Gray, 1ˢᵗ Edition, © MDCCCXXXI, EDINBURGH: Published by William Tait, Prince Street; LONDON: Published by Longman, Rees, Orme, Brown & Green; DUBLIN: W. Curry, Jun & Co., Chapter III, GENERAL PRINCIPLES OF THE SOCIAL SYSTEM, @ Page 39, "For, the labouring classes could never suffer from the want of employment for a single hour: individual anxieties respecting business would also be done away with, for, although industry and attention would be no less necessary than they are now, unmerited misfortune, in shape of bankruptcy, or failure, would be entirely prevented. The higher classes, too, would be provided with an excellent fund for the investment of their money......"

[45] A.) Chicago Sun Times, Monday, 03ʳᵈ July 2006, Founded 7ᵗʰ February 1947, NEWS Section, ONLINE Edition, How Did 2 With Criminal Pasts Get Jobs With Devine?: State's Attorney's Office To Review Files Of Shakedown Suspects, by Stefano Esposito, @ Page 8;

B.) Chicago Sun-Times, 21ˢᵗ August 2006, Founded 7ᵗʰ February 1947, NEWS Section, ONLINE Edition, Clout Wins Out In County Hiring, Too, by ABDON M. PALLASCH;

C.) Chicago Sun-Times, Friday, 20ᵗʰ October 2006, Founded 7ᵗʰ February 1947, NEWS Section, ONLINE Edition, Ex-Alderman's Son Was Off Work 9 Years, by Tim Novak;

D.) Chicago Sun-Times, Thursday, 09ᵗʰ February 2006, Founded 7ᵗʰ February 1947, NEWS Section, ONLINE Edition, County Worker Accused Of Wrongly Taking Tax Info, by Steve Patterson & Stefano Esposito;

E.) Chicago Tribune, Monday, 25ᵗʰ September 2006, Founded 10ᵗʰ June 1847, NEWS Section, ONLINE Edition, County Needs Fixing, Not Another Stroger, by Dennis Byrne;

F.) Chicago Sun-Times, Tuesday, 29ᵗʰ May 2007, Vol. LX, No. CIX, Founded 7ᵗʰ February 1947, NEWS Section, ONLINE Edition, Ex-Con On Payroll As Cash Disappears, by Steve Patterson,

[46] In this space, while the Petitioner was in the process of ascertaining the reasons Heartland Alliance was constantly denying the Petitioner employment since Q3 FY 2003 & while the Petitioner was at risk of losing interests in real property with the Northwoods Reality Group, Heartland Alliance's staff personnel were willfully refusing to prevent these losses from occurring, instead this willful refusal resulted in the Petitioner actually losing those interests at Northwoods Reality Group. This correlation was the residual effect of Heartland Alliance staff clearly indicating repeatedly to the Petitioner over the course of Q4 2004 to June 2005 in that rented space on the northeastern corner on the 5ᵗʰ Floor of the Institute For Cultural Affairs that doubled as over-night living arrangements for HIV/AIDS Jewish homosexuals:

   i.)      "Forget about working at Heartland!"
   ii.)     "It is our policy not to help you find work with Heartland!"
   iii.)    "We do not help people find work!"
   iv.)     "I was told not to help you find work!"
   v.)      "We do not buy work shoes for anyone!"
   vi.)     "You are not a good fit at Heartland!"
   vii.)    "We are the hiring managers and we decide what a good fit is at Heartland!"
   viii.)   "It is not our policy to contact Human Resources for you!"
   ix.)     "We are not going to contact Human Resources for you!"
   x.)      "You need a vacation, why don't you take a vacation?!"
   xi.)     "We do not care that you are losing your teeth, they are your teeth not our teeth!"
   xii.)    "We are not going to give you any health insurance!"
   xiii.)   "What is your problem?!"
   xiv.)    "Tell us about your childhood?!"
   xv.)     "We want you to take medication!!"
   xvi.)    "Are you a drug addict?!"

[47] (Back pay recoverable for refusal to hire) 58 ALR Fed 667

EEOC Form 5 (5/01)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 440-2008-00252 |

| Illinois Department Of Human Rights | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Paul P. Vega | (773) 377-5003 | 03-05-1964 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1246 W Pratt Blvd, Chicago, IL 60626 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| HEARTLAND ALLIANCE | 500 or More | (312) 660-1300 |

| Street Address | City, State and ZIP Code |
|---|---|
| 208 S Lasalle St, Chicago, IL 60604 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☒ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 01-01-2006    Latest: 01-01-2006
☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I applied for a position with Respondent on or around January 2006. I was not hired.

I believe that I have been discriminated against because Respondent has not replied to my email requests as to why I have not been hired.

**RECEIVED EEOC**

OCT 1 0 2007

**CHICAGO DISTRICT OFC**

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

10/10/2007

Oct 10, 2007
Date

Charging Party Signature

NOTARY – When necessary for State and Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

T 22 AUG 2006 E-mail 3Qs

N 14 March 2007 E-mail Refused reply to 3Qs

Silly Faggots HIV JEWS Homo

Follow Up on 10/31/2007 for status

Slavis          Soda
Kerrin         Susan
Spears         Coppage
Niedith       X5FY
Dr. J
Responder + Reply
Sat 11/19
Returned 11/16

Appendix II For Petitioner Paul Vega

EEOC Form 161B (3/98)                    **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To:  Paul P. Vega<br>1248 W Pratt Blvd<br>Chicago, IL 60626 | From:  **Chicago District Office**<br>**500 West Madison St**<br>**Suite 2800**<br>**Chicago, IL 60661** |

CERTIFIED MAIL 7099 3400 0014 4054 2099

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 440-2008-00252 | Eva Baran,<br>Investigator | (312) 353-7303 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐  Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐  While reasonable efforts were made to locate you, we were not able to do so.

☐  You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☒  The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐  Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

_John P. Rowes_                                    10-18-07

Enclosures(s)                    **John P. Rowe,**
                    **District Director**                    (Date Mailed)

cc:        **HEARTLAND ALLIANCE**